**INTERNATIONAL PAPER CO., Plaintiff,**

v.

**LLOYD MANUFACTURING CO., INC., Defendant.**

**No. 81 C 2438.**

United States District Court,
N.D. Illinois, E.D.

Dec. 29, 1982.

David McLauchlan, Lord, Bissell & Brook, Chicago, Ill., Martin H. Weisfuse, New York City, for plaintiff.

Michael K. Murtaugh, Baker & McKenzie, Bernard Harrold, Wildman, Harrold, Allen & Dixon, Tomas Morgan Russell, Sidley & Austin, Chicago, Ill., for defendant.

## MEMORANDUM OPINION AND ORDER

WILLIAM T. HART, District Judge.

This Court is faced with deciding a difficult and sensitive question: whether to disqualify an attorney and his law firm from continuing to represent a litigant in this case. The Court has very carefully reviewed the briefs and exhibits submitted by counsel, and on November 16, 1982, conducted an evidentiary hearing pursuant to the requirement of *Freeman v. Chicago Musical Instrument Co.,* 689 F.2d 715 (7th Cir. 1982). For the reasons stated below, the motion to disqualify is denied.

### I. *Background of the Instant Action*

The legal principles upon which the Court must base its decision are known. The United States Court of Appeals for the Seventh Circuit and several other courts have addressed the problems posed by motions for disqualification of counsel many times in recent years. It is in the application of these legal principles to complex fact situations that the Court sees greatest difficulty. Therefore, it is necessary to set forth in detail the intricacies of the allegedly conflicting representations.

This action was initiated by the plaintiff International Paper Company ("IP") bring-

ing suit against Lloyd Manufacturing Co. ("Lloyd").[1] IP alleges that Lloyd sold IP a product called green nitrile. Green nitrile is a kind of rubber sheeting which IP used as one component in its production of food dispensers. These food dispensers were purchased by Conway Imports, Inc. ("Conway"), which filled them with sauces and sold them to the McDonald's Hamburger Corporation ("McDonald's"). IP claims Lloyd warranted that green nitrile met Food and Drug Administration ("FDA") requirements and that it had received FDA approval as suitable for contact with food.

However, McDonald's soon determined that the sauces had been contaminated and that the green nitrile was at fault. McDonald's returned to Conway the dispensers, and they and their contents were destroyed. As a result, IP paid Conway $449,000, and claims to have suffered harm to its business reputation and goodwill. IP alleges that Lloyd's actions resulted in damages to IP of $10 million.

On December 8, 1981, the defendant Lloyd brought a Third Party Complaint against the Velsicol Chemical Corporation ("Velsicol") and Harwick Chemical Corporation ("Harwick"). Lloyd alleges that Velsicol manufactured Polyvel G–100, a hydrocarbon resin which is a component of green nitrile, and that Harwick distributed the Polyvel G–100 to Lloyd. Further, Lloyd claims that Harwick and Velsicol represented that Polyvel G–100 met FDA requirements and could be used in contact with food.

Harwick then brought a cross claim against Velsicol on May 3, 1982, alleging that any liability found against Harwick should be properly laid at Velsicol's doorstep. Harwick argues that all statements it made to Lloyd about Polyvel G–100 were made in reliance upon Velsicol's representations to Harwick. On the same day Harwick filed its cross claim, Velsicol moved to disqualify Harwick's counsel.

1. IP filed suit on August 7, 1980 in the United States District Court for the Southern District of New York. By court order and upon stipula- tions of the parties, the case was transferred to this Court.

Harwick is represented by Bernard Harrold ("Harrold") of the law firm of Wildman, Harrold, Allen & Dixon ("Wildman"). The basis for Velsicol's disqualification motion is that Harrold and the Wildman firm previously represented a former Velsicol employee and agent, Bernard Lorant ("Lorant"), in a criminal action. Velsicol argues that Harrold's representation of Lorant is substantially related to Wildman's current representation of Harwick, and that under applicable precedent disqualification is warranted here.

## II. Wildman's Prior Representation

In addressing disqualification questions, "[i]nitially, the trial judge must make a factual reconstruction of the scope of the prior legal representation." *Westinghouse Elec. Corp. v. Gulf Oil Corp.,* 588 F.2d 221, 225 (7th Cir.1978). The Court has heard testimony and examined documentary submissions and finds the facts to be as follows. Bernard Lorant was for 24 years an attorney and chemist for Velsicol. He was consulted as to regulatory matters pertaining to various Velsicol products. In 1970, Lorant left the direct employ of Velsicol but maintained a relationship with the company as outside counsel and consultant.

In 1975 a federal grand jury (No. 75 GJ 1541 [N.D.Ill.1975]) began a broad investigation into Velsicol and several of its employees and associates. A second grand jury (No. 76 GJ 2361 [N.D.Ill.1976]) was empanelled the next year to continue the investigation. The investigations were broad and far ranging, as can be demonstrated by quoting a few of the requests in the grand jury subpoenas:

Any and all minutes, records, notes, or documents of any kind, relating in any way to meetings of the Board of Directors and meetings of the Executive Committee of Velsicol Chemical Corporation, from January 1971 to the present.

\* \* \* \* \* \*

Any and all records or documents of any kind, relating in any way to litigation or investigations concerning Velsicol Chemical Corporation conducted by any Agency, Bureau, Service or Department of the United States, from January 1, 1971 to present.

\* \* \* \* \* \*

Any and all monthly reports for the Toxicology Group and the Regulatory Division of Velsicol from January 1, 1972 to June 30, 1975.

\* \* \* \* \* \*

Any and all records concerning the Regulatory Group and/or Regulatory Advisory Group meetings from January 1, 1974 to December 31, 1976.

(Affidavit of Neil R. Mitchell).

Eventually it became clear that six individuals associated with Velsicol, in addition to the Velsicol company itself, were targets of the grand jury investigations. The Washington, D.C. law firm of Williams & Connolly (at that time named Williams, Connolly & Califano) was retained as outside counsel to represent Velsicol in September, 1975. In October, 1975, the Wildman firm was retained to represent Lorant in regard to the same grand jury investigation. Each of the individuals (later defendants) subsequently retained separate outside counsel.[2] Velsicol completely paid for the legal fees incurred by all the individuals both during the investigations and subsequent prosecution. Over a six year period, Velsicol paid the Wildman firm nearly $500,000 for its representation of Lorant.

On December 12, 1977, an indictment naming Velsicol, Mitchell, Lorant, Gold and three others was handed down in the case of *United States v. Gold, et al.,* No. 77 CR 1073 (N.D.Ill.1978). The indictment charged that information relating to two pesticides produced by Velsicol, heptachlor and chlordane, had been withheld from the Environmental Protection Agency ("EPA").

---

**2.** For example, Ralph E. Brown of the Chicago law firm of Walsh, Case, Coale, Brown and Burke was retained as counsel for Neil R. Mitchell, general counsel of Velsicol and one of the subjects of the investigation. Donald R. Harris of the Chicago firm of Jenner & Block was retained to represent Harvey S. Gold, a Velsicol employee.

Williams & Connolly remained as Velsicol's counsel during the prosecution of this indictment, and the Wildman firm continued to represent Lorant. In addition, Williams & Connolly became co-counsel with the Wildman firm in representing Lorant. The Wildman firm never became co-counsel with Williams & Connolly in representing Velsicol.

Counsel for Velsicol and the six individual defendants cooperated in coordinating their defenses to the prosecution. They attended numerous meetings, had conference telephone calls, circulated drafts of legal pleadings prior to their filing, and communicated as to all important aspects of the defense. Hundreds of thousands of documents had been subpoenaed from Velsicol during the grand jury investigations leading to the indictment. Velsicol maintained copies of the subpoenaed documents in its Chicago headquarters, and counsel for Velsicol's co-defendants (including the Wildman firm) had access to these copies. Some of the subpoenaed documents were actually furnished to all counsel. The Wildman firm and Williams & Connolly discussed on several occasions the question of whether certain Velsicol documents came within the attorney-client privilege and therefore could be withheld from the grand jury (Velsicol Ex. 5).

During the course of the grand jury investigations, counsel for the defendants became convinced that there had been widespread prosecutorial misconduct. Consequently, the defendants moved for a dismissal of the indictment on grounds of gross prosecutorial abuse and misconduct before the grand jury. This motion was granted by Judge Leighton on April 20, 1979, and the indictment was dismissed. *United States v. Gold,* 470 F.Supp. 1336 (N.D.Ill.1979).

A third grand jury was empanelled (No. 79 GJ 1496 [N.D.Ill.1979]) and the investigation of Velsicol and the individual defendants was again pursued. Williams & Connolly continued to represent Velsicol, and the Wildman firm with Williams & Connolly as co-counsel continued to represent Lorant. This last grand jury investigation terminated when Velsicol pleaded *nolo contendere* to a one count information charging criminal contempt. Velsicol was sentenced on January 16, 1981 to pay a fine of $1,000. No criminal charges were brought against the former individual defendants.

The defense of all the defendants after the indictment was handed down in 1977 focused on three basic lines of attack: (1) moving to dismiss the indictment on grounds of prosecutorial misconduct; (2) if the indictment were not dismissed, the defendants intended to argue that no criminal violation had occurred and that all involved had acted according to law; and (3) if the indictment were not dismissed and a defense could not be made out that there had been no criminal violations, some of the defendants (in attempts to exonerate themselves) might have accused other defendants of having violated the law. Neither steps 2 nor 3 ever came into play since the indictment was dismissed.

Harwick has argued before this Court that the defense of Lorant diverged from the defense of Velsicol. However, the record does not support this contention. An attorney from Williams & Connolly who was actively involved in representing Velsicol and Lorant, Lawrence Lucchino, testified that the defenses of Velsicol and Lorant did not diverge. Harwick has presented no testimony to contradict Lucchino.[3]

Further, if the defenses of Velsicol and Lorant in fact diverged, Williams & Connolly would have found itself in a conflict

---

**3.** Harrold has submitted an affidavit in which he has sworn in conclusory fashion to the "factual averments" in Harwick's Memorandum in Opposition to Motion to Disqualify. Presumably, these "factual averments" include Harwick's argument that the defenses of Lorant and Velsicol were divergent. However, these conclusory averments were contradicted specifically by Lucchino when he testified on November 16, 1982. The Court notes that Harrold did not speak to the "divergent defenses" issue when he testified on the same day. Lucchino's version stands uncontradicted, and is accepted by the Court.

which probably would have required it to withdraw completely from the case: it would have been representing two defendants who were accusing each other of being culpable. The Court rejects Harwick's contention.

Ralph E. Brown, counsel to Neil Mitchell during the criminal proceedings, did testify that Mitchell and Lorant may have come to a point where their interests diverged and they became adverse co-defendants. However, this point was never reached since the indictment was dismissed because of prosecutorial abuse. In addition, Mitchell is not the party who seeks to disqualify the Wildman firm. Velsicol is that party. The Court finds that Wildman on behalf of Lorant and Williams & Connolly on behalf of Velsicol and Lorant presented a joint and common defense.

While the indictment focused on the status of the two pesticides heptachlor and chlordane, the testimony is in conflict as to the actual scope of the grand jury investigations. Lucchino testified that the central issue in the criminal case was Velsicol's compliance with regulatory obligations, but that the main focus of the grand jury investigations was EPA regulation (Tr. 9–10, 18–19). He never discussed Velsicol's hydrocarbon resins with the Wildman firm, nor were they of particular or specific interest to Williams & Connolly (Tr. 23–24).

Brown testified that the investigations were so broad that it was difficult to know what facets of Velsicol's business the grand juries were not prepared to investigate (Tr. 47–48). The investigation focused most intensely, however, on heptachlor and chlordane; none of the defense counsel discussed Polyvel G–100 or hydrocarbons (Tr. 48).

Harrold testified that the grand jury investigations focused on the two products heptachlor and chlordane, and grew out of proceedings before the EPA (Tr. 58). He knew nothing of the FDA status of hydrocarbon resins, and neither discussed nor heard of Polyvel G–100 or hydrocarbon resins until he was asked to represent Harwick in this suit (Tr. 52–54, 56–57, 59).

It is impossible for the Court to make a finding of fact as to the breadth or narrowness of the grand jury investigations. First, this Court has not been made privy to the grand jury testimony. Second, the testimony introduced before this Court by the attorneys representing some of the criminal defendants is so subjective that the Court finds itself unable to make a precise finding as to the scope of three grand jury investigations covering more than 18 months.

Nevertheless, certain things can be determined. Velsicol Ex. .1 and 2 reflect that among the Velsicol documents submitted to the grand jury were certain documents making reference to hydrocarbon resins.[4] The following statement is contained within Velsicol's monthly reports from the "Regulatory Division: Research and Development Department": "AD and XL Resins: Unofficial rejection of clearance by FDA: Submitted to FDA: 9–7–71: rejected: 2–16–72." This same notation appears in monthly reports from April, 1972, to December, 1973.

Another document submitted to the grand jury, "1973 1976 Operational Plan" (Velsicol Ex. 3), contains a paragraph which states: "Food additive petitions for the hydrocarbon resins (AD and XL) have not been submitted because of the problems previously discussed in connection with potential carcinogens . . . ." Another Velsicol document submitted to the grand jury, "Monthly Operating Report, February, 1972" (Ex. A, Memorandum in Support of Motion to Disqualify), states: "Hydrocarbon resins: FDA has refused the clearance of the AD and XL resins as food additives, until such time as Velsicol demonstrates the absence of poly-cyclic aromatic hydrocarbons in these products . . . ."

Harrold was asked whether he had ever seen any of the above-mentioned documents before. He replied that he had not seen them or any references to hydrocarbons until Velsicol brought this motion for disquali-

---

4. The hydrocarbon resins which are the subject of the instant case have been called at various times by several other names, including: Polyvel G–100; XL Resin; X–30; XL–30.

fication (Tr. 54 57). In addition, Harrold testified that he does not believe anything he learned during his representation of Lorant could help him in his representation of Harwick against Velsicol (Tr. 61).

The Court finds that Harrold and the Wildman firm had access to all of the Velsicol documents subpoenaed by the grand jury, including those submitted to this Court which make reference to hydrocarbon resins. However, Harrold did not see these references to hydrocarbon resins, and learned nothing from the documents which would aid him in the representation of Harwick against Velsicol.

### III.  Legal Issues

Velsicol argues in support of its motion to disqualify that Canons 4 and 9 of the ABA Code of Professional Responsibility and fundamental fairness all require the Court to grant their motion to disqualify ·Bernard Harrold and the Wildman firm.  .

■ The seminal case in the area of attorney disqualification is *T.C. Theatre Corp. v. Warner Bros. Pictures,* 113 F.Supp. 265 (S.D.N.Y.1953).  This case established the "substantial relationship" test for determining the circumstances under which an attorney must be disqualified.  It has been held that

> disqualification questions require three levels of inquiry.  Initially, the trial judge must make a factual reconstruction of the scope of prior legal representation.  Second, it must be determined whether it is reasonable to infer that the confidential information allegedly given would have been given to a lawyer representing a client in those matters.  Finally, it must be determined whether that information is relevant to the issues raised in the litigation pending against the former client.

*Westinghouse Elec. Corp. v. Gulf Oil Corp.,* 588 F.2d 221, 225 (7th Cir.1978).  If a court finds that the substantial relationship test has been met, it must then determine

whether disqualification is warranted. *Freeman v. Chicago Musical Instrument Co.,* 689 F.2d 715, 722 (7th Cir.1982).

The Court has previously made an extensive factual reconstruction of the scope of the Wildman firm's representation of Lorant, and Wildman's relationship with Velsicol.  Under the circumstances presented here, the second two steps of the *Gulf Oil* inquiry—whether it is reasonable to infer that confidential information was given, and whether such information is relevant to the issues raised in the instant litigation— are best dealt with by telescoping them into a single inquiry.  This is so because there is no question but that some confidential Velsicol information was conveyed to Wildman.[5]  The real issue is whether that confidential information is relevant to this lawsuit.

But there exists a threshold question: what was the relationship between Velsicol and Wildman?  Velsicol concedes that no formal attorney-client relationship existed between Wildman and Velsicol.  Instead, Velsicol argues that *Westinghouse Elec. Corp. v. Kerr-McGee Corp.,* 580 F.2d 1311 (7th Cir.), *cert. denied,* 439 U.S. 955, 99 S.Ct. 353, 58 L.Ed.2d 346 (1978), requires disqualification under the circumstances presented here even in the absence of an express attorney-client relationship.  The wide ranging grand jury investigations of Velsicol and the individual defendants, the great cooperation among counsel which gave Wildman access to all Velsicol documents, the opportunity given Wildman to learn about Velsicol's regulatory policies, practices, procedures, and personnel, all would give Harwick an unfair advantage in prosecuting its cross claim against Velsicol.

Harwick answers that there was no attorney-client relationship between Wildman and Velsicol, the *Kerr-McGee* analysis does not apply, the Wildman firm was never privy to confidences and secrets which it can now use against Velsicol on behalf of Harwick, and the applicable cases hold that under these circumstances Velsicol's motion

---

5. Wildman's billing statements (Velsicol Ex. 5), for example, show numerous meetings with Williams & Connolly held to discuss whether certain Velsicol documents were privileged.

**132**

to disqualify must be denied. The Court will examine the arguments in turn.

### A. Canon 4

Velsicol argues that Canon 4 requires that the Wildman firm be disqualified here. Canon 4 states: "A lawyer should preserve the confidences and secrets of a *client*" (emphasis added). Since Velsicol has agreed that Wildman and Velsicol never had a formal attorney-client relationship, they seek to come within the literal terms of Canon 4 by relying on *Westinghouse Elec. Corp. v. Kerr-McGee Corp., supra.*

Three of the defendants in *Kerr-McGee* (Gulf, Getty, and Kerr-McGee, hereinafter referred to as "Kerr-McGee") were members of the American Petroleum Institute ("API"), a trade association represented by Kirkland & Ellis ("Kirkland"). API retained Kirkland to analyze the antitrust considerations of legislation proposing divestiture in the oil industry. Kirkland's mission included interviewing various members of API (the movants among them), and in the course of this work Kirkland became privy to much secret and confidential information. On the same date Kirkland released its report to API—which report contained various references to API members' involvement in the production and marketing of uranium—Westinghouse filed suit against Kerr-McGee and others, alleging price-fixing in the uranium industry. Westinghouse was represented by Kirkland.

The district court denied Kerr-McGee's motion to disqualify Kirkland from representing Westinghouse on the grounds that there had been no attorney-client relationship between Kirkland and Kerr-McGee; such a relationship existed only between Kirkland and API. 448 F.Supp. 1284 (N.D. Ill.1978). The court of appeals reversed. 580 F.2d 1311 (7th Cir.1978). The moving defendants had consulted with Kirkland while entertaining reasonable beliefs that they were submitting confidential information to the law firm. This information had been solicited and given based upon the representation and understanding that Kirkland was acting in the undivided inter-

est of these companies. Under such circumstances an implied attorney-client relationship existed and Canon 4 was applicable. Kirkland could not be permitted to represent Westinghouse against Kerr-McGee in a lawsuit with issues substantially similar to the issues implicated by Kirkland's representation of its other "clients." *Id.* at 1321.

Velsicol has argued that Wildman's representation of Lorant is a *Kerr-McGee* type situation. This argument must fail. There is no evidence that Velsicol entertained a belief, reasonable or otherwise, that Wildman represented Velsicol during either the grand jury investigations or the prosecution of the indictment. Velsicol did not consult with the Wildman firm with the expectation of obtaining legal advice: the company was represented by Williams & Connolly in a most effective manner. The cooperation between Velsicol (through its attorneys) and the Wildman firm was due to Wildman's representation of one of Velsicol's co-defendants, Bernard Lorant.

The fact that Velsicol paid Wildman's attorney's fees for the representation of Lorant makes no difference. What determines whether an attorney-client relationship exists has nothing to do with the payment of legal fees. *Kerr-McGee, supra,* at 1317.

Instead, an attorney-client relationship exists "when the lay party submits confidential information to the law party with reasonable belief that the latter is acting as the former's attorney . . ." *Kerr-McGee, supra,* at 1312, 1321. Velsicol never had a "reasonable belief that it was submitting confidential information" to the Wildman firm. The *Kerr-McGee* "implied attorney-client relationship" is inapplicable.

Instead, this is quite clearly a "co-defendant case."

When information is exchanged between co-defendants and their attorneys in a criminal case, an attorney who is the recipient of such information breaches his fiduciary duty if he later, in his representation of another client, is able to use this information to the detriment of one of

the co-defendants, even though that co-defendant is not the one which he represented in the criminal case., *Wilson P. Abraham Const. Corp. v. Armco Steel Corp.,* 559 F.2d 250 (5th Cir.1977) [*per curiam*] (disqualification case).

*Kerr-McGee, supra,* at 1319. *See also Fred Weber, Inc. v. Shell Oil Co.,* 566 F.2d 602 (8th Cir.1977), *cert. denied,* 436 U.S. 905, 98 S.Ct. 2235, 56 L.Ed.2d 403 (1978), *overruled on question of appealability of denial of disqualification motion, In Re Multi-Piece Rim Products Liability,* 612 F.2d 377, 378 (8th Cir.1980), *vacated and remanded sub nom. Firestone Tire & Rubber Co. v. Risjord,* 449 U.S. 368, 101 S.Ct. 669, 66 L.Ed.2d 571 (1981) (court of appeals lacked jurisdiction to hear merits). It is clear that certain obligations arise in the co-defendant situation which might be cause for disqualification in a subsequent case. The parameters of these ethical constraints are set out in Canon 9. An attorney-client relationship— whether it be express or implied—must exist before a motion for disqualification can be predicated upon Canon 4. *Fred Weber, supra* at 608; *Wilson P. Abraham, supra; see also Development in the Law: Conflicts of Interest in the Legal Profession,* 94 Harv.L.Rev. 1244, 1321, 1331–2 (1981). Since no such relationship existed between Velsicol and Wildman, the Canon 4 argument must fail. Disqualification must be granted under Canon 9 or standards of fundamental fairness, or not at all.

### B. Canons 4 and 9 Contrasted

Canon 9 states: "A lawyer should avoid even the appearance of professional impropriety." This canon must be applied carefully. It has been said that "Canon 9 . . . is not intended to override the delicate balance created by Canon 4." *Schloetter v. Railoc of Indiana, Inc.,* 546 F.2d 706, 713 (7th Cir.1976), quoting *Silver Chrysler Plymouth v. Chrysler Motors Corp.,* 518 F.2d 751, 757 (2d Cir.1975). Though Canon 4 is not applicable to this co-defendant case, *Fred Weber, supra,* at 608, nevertheless it is important to contrast the different approaches implied by Canons 4 and 9.

A certain irrebuttable presumption arises under Canon 4: if it is reasonable to infer that confidential information would have been given to a lawyer representing a client in the prior matter, the Court presumes that such information was conveyed. *See Gulf Oil, supra,* at 224, and at n. 3. The policy behind this irrebuttable presumption is that the Court should not inquire into the confidences and secrets passing between a lawyer and a client.

There are two situations when a second presumption comes into play, and the courts have held that this second presumption must be rebuttable. The first situation is where a particular lawyer ("L") has represented a client ("C") in a matter. A motion for disqualification is filed when L's law firm (former or present) represents a party adverse to C in a related matter. The question is whether the irrebuttable presumption that C communicated confidences and secrets to L must be imputed to members of L's firm. Such a presumption of the imputation of confidences to firm members does exist, but this presumption has been held to be rebuttable. *See Freeman v. Chicago Musical Instrument Co.,* 689 F.2d 715, 722 (7th Cir.1982); *Novo Terapeutisk v. Baxter Travenol Lab.,* 607 F.2d 186, 197 (7th Cir.1979) (*en banc*). If firm members come forward with evidence that they did not receive confidences and secrets of C, disqualification will not be ordered.

The second situation in which a presumption may be rebutted is the one presented here. Where a former co-defendant ("co-D") has had access to the secrets and confidences of a former fellow co-defendant, now turned adversary ("A"), a presumption lies that co-D learned the secrets and confidences of A. But again, this presumption is a rebuttable one. *See Wilson P. Abraham, supra,* at 253; *Fred Weber, supra,* at 609. In such a case there must be a showing that co-D actually obtained confidential information in the course of the

prior representation which may be used in the present action to the detriment of A.[6]

So in this co-defendant case, the substantially similar *Gulf Oil* test must be met by Velsicol's showing that Wildman actually received confidential and secret information from Velsicol during the course of Wildman's representation of Lorant, which information may be used against Velsicol in this action.

## C. Canon 9 Applied

Velsicol has shown that Harrold and the Wildman firm had *access* to the Velsicol documents which mention hydrocarbon resins. But the question of having *access* is not the same as the question of having been *privy* to these secrets. A recent statement by the Seventh Circuit shows that access alone is not enough.

In *Freeman v. Chicago Musical Instrument Co., supra,* the plaintiff retained the Dressler law firm to represent him in a patent suit. During the pendency of the case an associate in the Dressler law firm, Eric C. Cohen, joined the Fitch law firm which represented the defendant. "Dressler claimed that Cohen had *access* to the confidences and secrets of their client, Freeman, in that it was a Dressler firm policy to distribute various legal opinions and memoranda to all lawyers of the firm. The Dressler law firm also claimed that cases were often discussed by members of the firm among each other, implying that Cohen was *privy* to Freeman's secrets and confidences." *Freeman, supra,* at 717 (emphasis added). Dressler also stated that the Freeman litigation files were stored immediately outside Cohen's office.

Cohen submitted affidavits claiming that he never worked on matters for Freeman and that he had no knowledge of the subject matter of the lawsuit. He also stated that "although various legal memoranda and opinions circulated at Dressler, he typically had been too busy to read them." *Id.* at 717. Based on the affidavits, the district court granted the motion to disqualify Cohen's new firm (Fitch), stating that the continued representation of the defendant by the Fitch firm "would result in an appearance of impropriety" and that it was "not appropriate for the court to inquire into whether actual confidences were disclosed." *Id.* at 717. The court of appeals reversed, and ordered that an evidentiary hearing be held to determine what in fact Cohen knew about the Dressler firm's representation of Freeman.

*Freeman* is applicable to the issues now before this Court. Cohen had *access* to confidential information which clearly was relevant to the litigation. (It was the same lawsuit.) Nevertheless, the district court was directed to hold an evidentiary hearing to determine as a matter of fact whether Cohen was actually *privy* to Freeman's confidences and secrets. *Id.* at 723, n. 12. *Freeman* stands for the proposition that a showing of *access* is not enough; there must be a showing that the lawyer was *privy* to the relevant secrets.

■ The Court finds that Wildman did have *access* to confidences and secrets of Velsicol, some of which are relevant to the issues in this litigation. But Harrold's testimony shows that Wildman did not have actual knowledge of—and therefore was not *privy* to—relevant confidences and secrets.[7] Therefore the presumption has been

---

**6.** The showing that the information may be used to A's detriment is the relevancy requirement of the third step of *Gulf Oil*. "Telescoping" steps two and three (see text at n. 5, *supra*) seems to be the proper approach in a co-defendant case, because in the course of a cooperative defense some confidences necessarily will be exchanged.

**7.** The fact that Wildman could have access to the hydrocarbon resins information without gaining such knowledge is not surprising. The criminal investigation clearly focused on al-

leged failures to disclose information to the EPA relative to the pesticides heptachlor and chlordane. Reporting requirements to the FDA were irrelevant. The regulatory status of a chemical to be used in connection with packaging prepared food—clearly not a pesticide—would have been of no interest to a lawyer representing Lorant in connection with the grand jury investigations and subsequent prosecution. It is true that Velsicol and Lorant presented a joint and common defense. But

rebutted, and under *Freeman, Fred Weber,* and *Wilson P. Abraham,* disqualification is not in order.

Velsicol states that the Wildman firm's representation of Harwick against Velsicol creates a clear appearance of impropriety, and that this alone requires disqualification. But faced with more compelling facts, the *Freeman* court held that the "possible appearance of impropriety, found to be determinative by the district court, is simply too weak and too slender a reed on which to rest a disqualification order in this case, particularly where the mere appearance of impropriety is far from clear." *Freeman, supra,* at 723.

Two witnesses before this Court testified that their firms would refuse to represent Harwick against Velsicol in this case. Ralph E. Brown of the Walsh, Case firm represented Neil R. Mitchell, general counsel of Velsicol, in the criminal investigation and prosecution. Brown stated that his firm would not undertake to represent a client against Velsicol under these circumstances because it would not pass "the smell test". He indicated that this firm policy is predicated more on practicality than on strict adherence to the ethical considerations.

Brown's point of view is commendable and this Court respects it. However, for two reasons it is not determinative. First, Brown represented an employee of Velsicol who was general counsel to that corporation. He clearly was privy to the workings of Velsicol from the inside out. By contrast, Wildman represented Lorant who, during the applicable period, was a consultant and outside counsel to Velsicol. The two representations are not equivalent.

■ The second (and more important) point is that the Seventh Circuit clearly rejected the "smell test" in *Freeman* when it stated that the possible appearance of impropriety there was too weak and too slender a reed on which to rest a disqualification order. Canon 9 requires more than a mere appearance of impropriety. There

this was a defense to the issues relevant to the

must be a showing that the attorney whose disqualification is sought actually received confidences which can now be used against the former co-defendant.

Lawrence Lucchino of Williams & Connolly also testified that his firm would refuse to represent a client adverse to Velsicol in a similar matter. Williams & Connolly was the attorney for Velsicol, so under such circumstances Canon 4 would apply. Therefore, the presumption that confidences were exchanged—including confidences relative to hydrocarbon resins—would be irrebuttable. Lucchino's statement of what his law firm would do under similar circumstances is unhelpful because the circumstances are not in fact similar. No attorney-client relationship, express or implied, existed between Wildman and Velsicol.

### D. Fundamental Fairness

■ Velsicol is most concerned that Harrold's representation of Lorant gave Wildman the opportunity to learn about the inner workings of the Velsicol company, and that in representing its co-defendant Wildman was provided with a "road map" of Velsicol. Neil Mitchell, general counsel for Velsicol, testified that in his opinion Wildman's representation of Lorant disclosed to Wildman the personalities, strengths and weaknesses of Velsicol people, information which would be very difficult to obtain in civil discovery (Tr. 36, 42). According to Mitchell, this information would give the Wildman firm (on behalf of Harwick) an unfair advantage.

This argument must also be rejected. What Velsicol objects to is that the Wildman firm may understand early on in this litigation the organization and makeup of the Velsicol corporate structure. They aptly call this a "road map." Such a road map, however, is easily plotted through the use of interrogatories and several initial depositions. Even assuming Wildman starts off with such information, this does not require disqualification.

investigations and prosecution.

It has been held that the familiarity with a company's corporate structure and personality is not enough to warrant disqualification. In *Westinghouse Elec. Corp. v. Rio Algom, Ltd.,* 448 F.Supp. 1284 (N.D.Ill.1978), one of the defendants, Noranda, moved to disqualify Kirkland as counsel for Westinghouse. Kirkland previously had represented Noranda for two years.[8] It was argued that "Kirkland advised Noranda on the impact of U.S. antitrust, corporation, securities, and tax laws on [a] proposed exchange offer," and that in the course of the previous representation, "Kirkland acquired intimate knowledge of Noranda's corporate organization, officers, marketing methods, [and] business philosophy ..." Thus "[b]ecause Kirkland has had access to confidential information on Noranda's intercorporate connections and that information is highly relevant to proving certain allegations of the Westinghouse complaint, Kirkland must be disqualified to prevent the disclosure of client confidences and the use of those confidences against Noranda in the present action." *Rio Algom, supra,* at 1306–1308.

Judge Marshall denied the motion to disqualify Kirkland vis a vis Noranda, and the decision was affirmed. *Westinghouse Elec. Corp. v. Kerr-McGee Corp.,* 580 F.2d 1311, 1322 (7th Cir.), *cert. denied,* 439 U.S. 955, 99 S.Ct. 353, 58 L.Ed.2d 346 (1978). General knowledge of a corporation's organization and supporting personalities, which can quickly and easily be learned through the civil discovery process, is not enough to warrant disqualification. Velsicol's "road map" theory fails to support its motion to disqualify the Wildman firm.

Velsicol also argues that Wildman learned about the "regulatory process" at Velsicol, and that this knowledge will greatly help Harwick in this case. In *Rio Algom,* Kirkland had an understanding of Noranda's marketing methods and had counseled the company on antitrust matters. Nevertheless, Kirkland was not disqualified from representing Noranda's adversary in prosecuting a price-fixing case. For the same reasons, Wildman's familiarity with Velsicol's regulatory process does not support the motion to disqualify.[9] Allegations of vague general background knowledge are not enough.

Finally, Velsicol argues that *Cannon v. U.S. Acoustics Corp.,* 398 F.Supp. 209 (N.D.Ill.1975), *adopted and affirmed* 532 F.2d 1118 (7th Cir.1976), requires disqualification here because as in *Cannon,* Wildman's representation of Velsicol's co-defendant "was so lengthy and pervasive that [it] would have to be disqualified under Canon 9." 398 F.Supp. at 228–9. *Cannon,* however, is inapplicable.

*Cannon* was a named plaintiff suing the defendant corporation in a shareholders derivative action. Cannon had been counsel to the defendant for twelve years prior to his terminating the relationship and bringing this suit. Judge Marshall disqualified Cannon as a party plaintiff in the litigation, and on appeal this decision was affirmed. The relationship between Cannon and the defendant was clearly different from the relationship between Wildman and Velsicol. *Cannon* might be applicable if Neil Mitchell or possibly Bernard Lorant were the named plaintiff in a shareholders derivative suit brought against Velsicol. But that is not even analogous to the situation presented here.

## IV. Conclusion

The evidence presented to the Court and the cases discussed above show that disqualification is not proper.

THEREFORE, IT IS ORDERED that Velsicol's motion to disqualify is denied.

---

8. The *Rio Algom* litigation was the same case described above as *Kerr-McGee* (the name of one of the appeals). There was no doubt that Kirkland had had an attorney-client relationship with Noranda, in contradistinction to the other defendants who moved for Kirkland's disqualification.

9. It is important to note that the criminal action focused on EPA regulations, while the instant case involves questions regarding the FDA.

Velsicol is ordered to answer Harwick's cross claim within twenty (20) days of the date of this order. A status hearing is set for February 16, 1983 at 9:30 a.m.