**DCA FOOD INDUSTRIES, INC., Plaintiff,**

v.

**TASTY FOODS, INC., Tapud Co. a/k/a Sha'ar Hanegev Ltd. and Jack Scanlon, Defendants.**

No. 85–C–364–C.

United States District Court, W.D. Wisconsin.

Sept. 3, 1985.

John W. Markson, Bell, Metzner & Gierhart, S.C., Madison, Wis. (Alfred B. Engelberg, New York City, of counsel), for plaintiff.

John C. Mitby, Madison, Wis. (Maurice B. Stiefel, Stiefel, Gross, Kurland & Pavane, P.C., New York City, of counsel), for defendants.

## ORDER

CRABB, Chief Judge.

Plaintiff DCA has brought this action for patent infringement against the defendants. DCA alleges that it is the owner, as assignee of Yechiel Smadar, of United States Patent No. 3,650,766 (DCA '766 patent) covering an invention entitled "Extruded Food Products and Method of Producing Same"; that defendants Tasty Foods and Scanlon are infringing the DCA '766 patent by the sale and offering for sale of extruded onion rings; and that defendant Tapud is actively inducing and contributing to the infringement of the DCA '766 patent by defendants Tasty Foods and Scanlon by manufacturing the onion rings and delivering them to Tasty Foods and Scanlon. DCA further alleges that the process used by Tapud to produce extruded onion rings is described in United States Patent No. 4,436,759 (the '759 patent) issued in the names of David M. Trilling and Yechiel Smadar entitled "Production of Shaped Food Products," and that the extruded onion ring production process of the '759 patent infringes the claims of the DCA '766 patent. DCA seeks declaratory and injunctive relief and money damages for the alleged infringement. Jurisdiction is asserted under 28 U.S.C. § 1338(a).

The defendants are represented by Maurice B. Stiefel of the New York law firm of Stiefel, Gross, Kurland & Pavane, P.C., and by John C. Mitby of the Madison firm of Brynelson, Herrick, Gehl & Bucaida. DCA has moved to have Stiefel disqualified from representing the defendants in this case, asserting that because of Stiefel's prior relationship with DCA in connection with

an earlier action involving the DCA '766 patent, he may not now represent the defendants. For the reasons discussed in this order, I will deny the motion to disqualify Stiefel.

From affidavits submitted by Alfred B. Engelberg, Maurice B. Stiefel and Yechiel Smadar, I find the following facts for the purposes of deciding this motion.

## FACTS

Yechiel Smadar was employed by DCA from 1968 to 1971, during which time he invented the subject matter claimed in the DCA '766 patent. (Prior to working for DCA, Smader had worked for Nabisco.) Smadar assigned his interest in the patent to DCA. From 1973 through 1977 Smadar had a consulting agreement with DCA, under which he agreed to be available for consultation, to maintain in confidence any confidential information received from DCA, and not to engage in any competing business. Under the agreement, Smadar received $3,000.00 per year in 1973 and 1974, and $2,000.00 per year in 1975, 1976 and 1977. At the time of the meetings and deposition at issue in this motion, Smadar was not a DCA employee and had no contractual relationship with DCA. Shortly after the deposition, DCA paid Smadar $5000.00 for his cooperation in preparing for and giving deposition testimony.

In 1975, DCA became involved in litigation in which the validity, enforceability and infringement of the DCA '766 patent were at issue. *Modern Maid et al. v. DCA Food Industries, Inc.*, No. 75 Civ. 1785 (E.D.N.Y.). In late 1977, in connection with this litigation, Smadar was subpoenaed by Modern Maid to appear at a deposi-

tion. After discussions among DCA's attorney (Alfred Engelberg), Smadar's personal attorney (David Drabkin) and Modern Maid's attorney, Smadar agreed to appear voluntarily at a deposition, at DCA's expense, in January of 1978. DCA, Smadar, and Drabkin also agreed that Smadar could retain additional patent counsel at DCA's expense. At Drabkin's recommendation, Smadar retained Maurice B. Stiefel. Neither DCA nor Engelberg was involved in Smadar's selection of Stiefel.

Engelberg, Stiefel, and Smadar agreed to meet prior to Smadar's deposition to prepare Smadar for the deposition. On December 20, 1977, Engelberg sent Stiefel a number of documents to review, all of which were matters of public record. The three met in Engelberg's office on January 23 and 24, 1978. Engelberg's recollection of what was discussed at that meeting seven years ago differs from Stiefel's and Smadar's recollections.

The Nabisco materials discussed at the January 23 and 24 meetings were confidential proprietary information of Nabisco, not DCA.[1]

The prior art patents reviewed at these meetings involved public documents, not DCA's confidential proprietary material.[2]

Smadar was deposed on January 25 and 26, 1978. The deposition transcripts show appearances by Stiefel on behalf of the witness Smadar and Engelberg on behalf of DCA.

In 1981, Smadar and David Trilling retained Stiefel to prepare and prosecute a patent application on their invention involving extruded food products. In March, 1984, this application issued as the '759

---

1. I find this fact after considering Engelberg's assertions that he discussed with Smadar and Stiefel certain Nabisco documents, and the fact that Smadar had worked for Nabisco before coming to DCA, and that the documents included Smadar's Nabisco laboratory notebooks. Smadar's 1978 deposition testimony confirms that Engelberg showed him this material; Stiefel does not remember seeing any Nabisco documents. DCA obtained these materials from Modern Maid in the course of discovery, subject to a protective order. This order states that the

Nabisco documents "shall be treated as confidential proprietary information of Nabisco...."

2. I find this fact after reviewing the affidavits in which Engelberg says that the three men reviewed prior art patents at the meetings, and both Smadar and Stiefel say they recall discussing the prior art Rivoche patent. Stiefel asserts, and Engelberg does not dispute, that any review of prior art patents involved only public documents.

patent, with Caribou Fisheries, Inc. of Boston as assignee. Defendants operate under the '759 patent and it is this patent that plaintiff alleges infringes the DCA '766 patent. Stiefel is being paid by Smadar to represent defendants in this action.[3]

## DISPUTED FACTS

Because of the differing versions of the January 23 and 24 meetings set forth by Engelberg, Smader, and Stiefel in their affidavits, I can make no findings of fact on this subject except with respect to a few undisputed details set forth above. Set forth below is a summary of each person's recollection.

Engelberg states that he is unable to recall the details of his conversations with Stiefel and Smadar, but that his primary concern was to refresh Smadar's recollection fully about his role in the development of the invention leading to the DCA '766 patent, and he says that this required a "comprehensive review" of Smadar's participation. Whether that review included Smadar's DCA notebooks, which had remained in DCA's possession, and other DCA documents is disputed. Engelberg points to the following passage in Smadar's 1978 deposition to support his assertion that Smadar reviewed Smadar's DCA notebooks:

Q  Can I draw your attention to page 18, Mr. Smadar, of that same notebook.

A  Yes.

Q  There is a note down at the bottom, near the bottom, it says, "a more detailed planning is in the onion ring folder."

Did you maintain a separate onion ring folder by that name?

A  Yes, as a matter of fact, I thought about this folder.

I mentioned it to Mr. Engelberg the other day.

Both Smadar and Stiefel deny that there was a comprehensive review of Smadar's role in the invention. Like Engelberg, Stiefel says he has no specific recollection of

the discussions. He does not remember seeing Smadar's DCA notebooks and states that he is confident that he would recall them if he had. Smadar states that they did not review his DCA notebooks, citing the following testimony from his deposition:

Q  Are they in your notebook, that is what I am asking you.

MR. ENGELBERG: I object. I want to note for the record that the—counsel has had these notebooks for two years, and the witness has had them for two minutes, and there are four hundred pages here, and I don't see anyway this witness could be expected to know what is on every page of this notebook that he probably has not seen—

Q  Did you reveiw [sic] these notebooks before this deposition?

A  No

Engelberg asserts that in addition to reviewing the factual history of the invention, "it would have been crucially important for me to provide Mr. Smadar and Mr. Steifel [sic] with my detailed impressions and conclusions with respect to the major strengths and weaknesses of our litigation position and the types of 'trap' questions that might be asked during a skillful cross-examination for the purpose of furthering Modern Maid's attack on the DCA '766 patent." However, Engelberg does not state that he actually recalls this discussion. Stiefel says that he has no recollection of such a discussion and that he strongly doubts this discussion took place.

## OPINION

The precepts of the Code of Professional Responsibility as well as the prior case law determine the resolution of the ethical questions presented by the plaintiff's motion to disqualify Stiefel. The fundamental principle to be applied is the ethical obligation of the lawyer to maintain the confidentiality of information relating to the

---

**3.** Although the record does not reveal Smadar's present relationship with the defendants, I accept for the purposes of this motion DCA's asser-

tion in its memorandum that "Mr. Stiefel is Mr. Smadar's attorney and is being paid by Mr. Smadar to defend the defendants in this action."

representation of his or her client (Canons 4 and 9).[4] *See Freeman v. Chicago Musical Instrument Co.*, 689 F.2d 715, 721 (7th Cir.1982).

The law imposes on courts the duty to safeguard the confidentiality of the attorney-client relationship, and provides them the authority to disqualify counsel as one means of insuring that Canons 4 and 9 are not violated. *Freeman*, 689 F.2d at 721. At the same time, courts must bear in mind that "a party to litigation also has an important interest in enjoying the counsel of its choice, and the prophylactic rule [of disqualification] ought not to be applied so indiscriminately as to undercut this interest without justification." *Moritz v. Medical Protective Co.*, 428 F.Supp. 865, 874 (W.D. Wis.1977). Although disqualification of counsel protects one attorney-client relationship, it destroys another such relationship by depriving a party of its prerogative to proceed with counsel of its choice. For this reason, the Court of Appeals for the Seventh Circuit has described disqualification as "a drastic measure which courts should hesitate to impose except when absolutely necessary." *Freeman*, 689 F.2d at 721; *see also Schiessle v. Stephens*, 717 F.2d 417, 420 (7th Cir.1983).

## I. Disqualification under Canon 4

■ The appropriate test for disqualification of an attorney under Canon 4 is well settled in this circuit. When a lawyer represents a party in a matter in which the adverse party is that lawyer's former client, the lawyer may be disqualified if the subject matter of the two representations is "substantially related." *See LaSalle National Bank v. County of Lake*, 703 F.2d 252, 255 (7th Cir.1983); *Westinghouse Electric Corp. v. Gulf Oil Corp*, 588 F.2d 221, 223 (7th Cir.1978). Once a court finds that there is a substantial relationship between the two representations, it must proceed to determine whether disqualification is warranted. *Freeman*, 689 F.2d at 722; *International Paper Co. v. Lloyd Manufacturing Co.*, 555 F.Supp. 125, 131 (N.D. Ill.1982).[5]

But there is a threshold question which must be answered before the court may apply the substantial relationship test: whether there was an attorney-client relationship between DCA and Stiefel that would subject Stiefel to the obligations of Canon 4. *See Hughes v. Paine, Webber, Jackson & Curtis Inc.*, 565 F.Supp. 663, 667, 669 (N.D.Ill.1983); *International Paper*, 555 F.Supp. at 131. DCA concedes that no formal attorney-client relationship existed between DCA and Stiefel. Instead, DCA relies on *Westinghouse Electric Corp. v. Kerr-McGee Corp.*, 580 F.2d 1311 (7th Cir.), *cert. denied* 439 U.S. 955, 99 S.Ct. 353, 58 L.Ed.2d 346 (1978), for its argument that its relationship with Stiefel comes within the terms of Canon 4.

In *Kerr-McGee*, three of the defendants, including Kerr-McGee, were members of the American Petroleum Institute, a trade association represented by Kirkland & Ellis. The institute retained Kirkland to analyze the antitrust aspects of proposed oil industry divestiture legislation. Kirkland's tasks included interviewing various members of the institute, among them Kerr-McGee, and in the course of this work Kirkland acquired secret and confidential information. Kirkland filed a report with the institute which contained references to

---

4. Canon 4 states: "A Lawyer Should Preserve the Confidences and Secrets of a Client." Canon 9 states: "A Lawyer Should Avoid Even the Appearance of Professional Impropriety."

5. A finding of a substantial relationship does not always require disqualification. When the successive representations involve not the same individual attorney but different members of a law firm successively representing adverse parties, or when one member of a law firm changes jobs and later she or her new firm is retained by an adversary of a client of her former firm, the court must examine the sharing of confidences among the members of the firm or firms involved before determining that disqualification is appropriate. *See, e.g., Schiessle*, 717 F.2d at 420–21; *Analytica, Inc. v. NPD Research, Inc.*, 708 F.2d 1263, 1266–68 (7th Cir.1983). This additional analysis is unnecessary in this case because Stieffel himself was involved in both the 1978 discussions and the present representation; he would necessarily have been privy to any confidential information discussed in both situations.

its members' involvement in the production and marketing of uranium. On the same day Kirkland released its report to the institute, another client of Kirkland & Ellis, Westinghouse, filed suit against Kerr-McGee and others, alleging price-fixing in the uranium industry.

The district court denied Kerr-McGee's motion to disqualify the Kirkland firm on the grounds that there had been no attorney-client relationship between Kirkland & Ellis and Kerr-McGee, only a relationship between the firm and the American Petroleum Institute. 448 F.Supp. 1284, 1303 (N.D.Ill.1978). The court of appeals reversed, noting that Kerr-McGee had submitted confidential information to Kirkland & Ellis with the reasonable belief that the firm was acting in the undivided interest of Kerr-McGee and the other institute members. 580 F.2d at 1321. The court of appeals held that an implied attorney-client relationship and its attendant ethical obligations may arise "when the lay party submits confidential information to the law party with reasonable belief that the latter is acting as the former's attorney...." 580 F.2d at 1312, 1319–20; *see also International Paper,* 555 F.Supp. at 132.

In the recent case of *Analytica, Inc. v. NPD Research, Inc.,* 708 F.2d 1263 (7th Cir.1983), the Court of Appeals for the Seventh Circuit again discussed how the sharing of confidential information may create an attorney-client relationship. Malec was an employee and one of three co-owners of NPD. The other two co-owners offered Malec additional shares in the company, and told Malec to find a lawyer who would structure the transaction in the least expensive way. Malec contacted Fine of the law firm of Schwartz & Freeman. Fine devised a plan that required him to place a value on the NPD stock. NPD gave Fine the information necessary for the valuation, including information on NPD's financial condition, sales trends and management, and Fine fixed a value which the corporation adopted. Fine billed NPD for his services and NPD paid the bill.

Several months later, Malec left NPD and sold his stock back to the other co-owners. At the same time, Malec's wife, who also had worked for NPD, also left NPD and formed Analytica. (Malec himself never had a position with Analytica.) Less than a year after the Malecs had left NPD and Analytica had been formed, Analytica retained Schwartz & Freeman as its counsel in a private antitrust action Analytica brought against NPD.

On NPD's motion, the trial court disqualified Schwartz & Freeman from representing Analytica. On appeal, Schwartz & Freeman did not assert that it had not received confidential information about NPD in the course of the stock transfer representation, but argued that its client had been Malec, not NPD. The court rejected this argument on two grounds. First, all three NPD shareholders, not just Malec, had retained the firm. The court noted that all three had had a common interest in structuring the transfer as cheaply as possible, that NPD paid the legal bill (and apparently NPD did not usually pay its officers' legal expenses), and that neither NPD nor the other shareholders were represented by other counsel. 708 F.2d at 1268. Second, it made no difference whether NPD or Malec was the client; disqualification was necessary under the *Kerr-McGee* decision.

> If NPD did not retain Schwartz & Freeman—though we think it did—still it supplied Schwartz & Freeman with just the kind of confidential data that it would have furnished a lawyer it had retained.... NPD thought Schwartz & Freeman was its counsel and supplied it without reserve with the sort of data ... that play a key role in a monopolization suit....

708 F.2d at 1269.

■ Under *Kerr-McGee* and *Analytica,* therefore, a party seeking to establish an implied attorney-client relationship for the purposes of the Code must show (1) that it submitted confidential information to a lawyer, and (2) that it did so with the

reasonable belief that the lawyer was acting as the party's attorney.

■ Turning to the case before the court, I will examine these requirements as they bear on DCA's motion, guided by the rule that "the moving [party] bear[s] the heavy burden of proving facts required for disqualification." *Evans v. Artek Systems Corp.*, 715 F.2d 788, 794 (2d. Cir.1983); *see also Government of India v. Cook Industries, Inc.*, 569 F.2d 737, 739 (2d. Cir.1978) ("high standard of proof" applied in disqualification matters).

Although, as set forth above, Engelberg asserts that he discussed several types of confidential information with Smadar and Stiefel, I conclude that DCA has not met its burden of proof on this point. The present record does not permit a factual finding to the effect that Engelberg provided Smadar and Stiefel with confidential information about Smadar's work at DCA. Moreover, even if I could find that Engelberg had engaged in an extensive review of Smadar's work with Smadar and Stiefel, I question whether it would be accurate to describe such an exchange as the disclosure of confidential information. If a comprehensive review of Smadar's work at DCA did take place, the discussion would have involved information with which Smadar was already familiar. Smadar could have discussed this information with Stiefel even if Engelberg had not provided Stiefel with Smadar's notebooks, though any material which Engelberg might have provided would likely have refreshed Smadar's recollection. DCA does not assert that Engelberg revealed any proprietary information about the DCA '766 patent that Smadar did not already know.

Engelberg claims that the Nabisco documents the three reviewed were confidential material. Because this material was proprietary to Nabisco, not DCA, Engelberg did not disclose any of DCA's confidential information when he showed the Nabisco material to Smadar and Stiefel.

Engelberg also describes the discussions of prior art patents with Smadar and Stiefel as a disclosure of confidential information. These discussions involved a review of DCA's copies of public documents and therefore did not constitute a disclosure of confidential information.

Engelberg states that it would have been important for him to give Smadar and Stiefel his impressions and conclusions about the strengths and weaknesses of DCA's litigation position in the *Modern Maid* case. Undoubtedly such information would have been confidential. But Engelberg does not recall that he actually shared his legal opinions, and Stiefel does not recall any such discussion. I conclude that DCA has not met its burden of proof on whether Engelberg shared confidential work-product information with Stiefel and Smadar.

Even if DCA had met its burden of proof on the sharing of confidential information, it has not shown that it did so in the reasonable belief that Stiefel was acting as its attorney. Smadar was not an officer, employee or agent of DCA. *Cf. Analytica*, 708 F.2d at 1268. Engelberg was aware that it was Smadar, not DCA, who had selected and retained Stiefel, and was certainly aware that DCA had its own counsel. *Id.* There is no evidence that DCA or Engelberg consulted with Stiefel with the expectation of obtaining legal advice. *Cf. International Paper*, 555 F.Supp. at 132. The fact that DCA paid Stiefel's attorney's fees for the representation of Smadar does not establish an attorney-client relationship between DCA and Stiefel. *See Kerr-McGee*, 580 F.2d at 1317; *International Paper*, 555 F.Supp. at 132.

DCA asserts that there was a "unanimity of interest" between DCA and Smadar analagous to that in *Kerr-McGee* or *Analytica*. Yet the record shows no such common interest. Undoubtedly DCA hoped that Smadar's testimony would be useful in its defense of the *Modern Maid* case. But at the time of the 1978 meetings and deposition, Smadar had no financial interest in the validity of the DCA '766 patent and he

did not have any contractual relationship with DCA.

Engelberg contends that he treated Stiefel as co-counsel. I conclude, however, that whatever subjective impression Engelberg may have had about Stiefel's role, under these circumstances he could not have reasonably believed that Stiefel was acting as DCA's attorney.

II. Disqualification under Canon 9

■ DCA asserts that Stiefel should be disqualified under the general admonition of Canon 9 that a lawyer should avoid even the appearance of professional impropriety. However, Canon 9 is not to be interpreted to "override the delicate balance created by Canon 4." *Schloetter v. Railoc of Indiana*, 546 F.2d 706, 713 (7th Cir.1976), quoting *Silver Chrysler Plymouth, Inc. v. Chrysler Motors Corp.*, 518 F.2d 751, 757 (2d Cir.1975). When a lawyer has demonstrated that his or her conduct is within the bounds of Canon 4, the possible appearance of impropriety is "simply too weak and too slender a reed on which to rest a disqualification order ... particularly where the mere appearance of impropriety is far from clear." *Freeman*, 689 F.2d at 723; *see also Interstate Properties v. Pyramid Co. of Utica*, 547 F.Supp. 178, 183 (S.D.N.Y. 1982).

Under the circumstances of this case, I find that there is no appearance of impropriety in Stiefel's representation of the defendants. Moreover, having already concluded that disqualification is not warranted under Canon 4, I would be extremely reluctant to hold that disqualification is required under Canon 9 even if there were some appearance of impropriety. I conclude, therefore, that Canon 9 does not require Stiefel's disqualification in this case.

## ORDER

IT IS ORDERED that plaintiff's motion to disqualify defendants' attorney is DENIED.