Whitfield HUGHES, Jr.; Raymond Mesirow; Lilli Mesirow; Bernard Resnick; and Irwin Weiner, Plaintiffs,

v.

PAINE, WEBBER, JACKSON & CURTIS INCORPORATED; Thomas Furnari; and Hillel Maier, Defendants.

No. 81 C 5075.

United States District Court,
N.D. Illinois, E.D.

May 27, 1983.

On Motion for Reconsideration
June 16, 1983.

Stanley A. Walton III, Winston & Strawn, Chicago, Ill., for plaintiffs.

L. Andrew Brehm, Michael B. Roche, Roger L. Longtin, Hubachek & Kelly, David J. Shukovsky, Richard G. Schoenstadt, Siegel, Denberg, Vanasco, Shukovsky, Moses & Schoenstadt, Chicago, Ill., for defendants.

## MEMORANDUM AND ORDER

MORAN, District Judge.

The defendants, Hillel Maeir ("Maeir") and Paine, Webber, Jackson & Curtis, Inc. ("Paine Webber"), have moved this court to disqualify the law firm of Arvey, Hodes, Costello & Burman ("Arvey Hodes") from any further representation of any of the plaintiffs in this action.[1] For the reasons stated below, the motion to disqualify is denied.

## I. FACTS

Proper disposition of a motion to disqualify requires a careful examination of the allegedly conflicting representations. *International Paper Co. v. Lloyd Manufacturing Co.,* 555 F.Supp. 125, 127 (N.D.Ill.1982).

---

1. Although the third defendant, Thomas Furnari, is not a party to the disqualification motion, the analysis herein applies to him as well.

Piecing together the parties' various memoranda, affidavits and exhibits reveals the following account. In the summer of 1980 Raymond and Lilli Mesirow (the "Mesirows"), two of the plaintiffs in this action, consulted with Sidney Sosin ("Sosin"), a partner at Arvey Hodes, regarding certain complaints about the handling of their option accounts at Paine Webber by Maeir and Thomas Furnari ("Furnari"). On October 9, 1980, Sosin wrote to Paine Webber outlining the Mesirows' complaints, identifying Maeir and Furnari as the persons involved, and requesting a settlement of the alleged damages. Paine Webber furnished Maeir with a copy of this letter[2] and requested him to prepare a written response thereto.[3]

On January 14, 1981, Maeir, represented by a Paine Webber attorney, testified voluntarily and without subpoena before the Securities Exchange Commission ("SEC") regarding an investigation focusing on the option accounts of five Paine Webber customers (including the Mesirows) who subsequently became the plaintiffs in this case. In his deposition taken in the instant litigation, Maeir claims he answered the SEC's questions candidly, openly and truthfully. Maeir further claims that he left the five-hour interrogation believing that he had concealed nothing.

Up to this point Maeir and Paine Webber had been represented by the same attorneys. During the summer of 1981, however, Maeir became concerned over whether to retain separate counsel for the pending SEC investigation. At the suggestion of a fellow employee, Maeir scheduled an appointment with Allen Barry Witz ("Witz"), an Arvey Hodes partner, to discuss the possibility of separate representation. Although the exact date is uncertain, it appears that in early July of 1981 Maeir met with Witz and an Arvey Hodes associate, Andrew B. David ("David"), in Witz's office. The parties disagree over the length of this meeting; it appears to have lasted between forty-five minutes and an hour. Also disputed is what was discussed at the meeting. Witz and David claim that the "central and exclusive business of the meeting" was a consideration of the benefits versus the additional expense of retaining separate counsel. Maeir asserts that, in addition to this consideration, he "openly and candidly recounted" all the facts and circumstances concerning the accounts under investigation by the SEC. Maeir further claims that he disclosed information at this meeting which was outside the scope of his SEC testimony.[4]

All the parties agree, however, that no threatened litigation by customers of Paine Webber was discussed. The parties also agree that Maeir was not informed at this meeting that Arvey Hodes represented the Mesirows in connection with the very same matters that Maeir claims to have discussed with Witz and David. Additionally, Maeir claims he assumed that his revelations to the Arvey Hodes attorneys were confidential and subject to the attorney-client privilege, though he ultimately decided not to retain that law firm to represent him.

On September 8, 1981, the Mesirows, along with Whitfield Hughes, Jr., Bernard Resnick and Irwin Weiner, filed a thirty-two count complaint against Paine Webber, Maeir and Furnari for damages caused by the activities under SEC investigation. At this time plaintiffs were represented by the law firm of Winston & Strawn. Six months later Winston & Strawn withdrew from the case and on March 17, 1982, Jeffrey R. Liebman ("Liebman") and Gary L.

**2.** Written on Arvey Hodes letterhead, the letter prominently displayed the firm's name and address, as well as a listing of its partners and associates.

**3.** On October 31, 1980, approximately one week before Maeir responded to Sosin's letter, Sosin again wrote to Paine Webber. Having learned that the SEC was investigating the subject matter of the Mesirows' complaints, Sosin informed Paine Webber, in his second letter, that neither the Mesirows nor Arvey Hodes had initiated the investigation.

**4.** Maeir also asserts that David took handwritten notes of what was said at the meeting. Arvey Hodes admits that David may have done so; however, it claims that such notes, if taken, have since been discarded and cannot be found.

Starkman ("Starkman") of Arvey Hodes, appeared as substituted counsel for the plaintiffs. As soon as Maeir realized that Arvey Hodes was representing the plaintiffs he informed his attorney, Michael B. Roche ("Roche"), of the meeting with Witz and David. Roche thereupon contacted Liebman, informed him of the situation, and requested him to voluntarily withdraw as counsel. Liebman eventually refused to do so, and the defendants moved to disqualify Arvey Hodes as plaintiffs' counsel.

## II. PRINCIPLES GOVERNING ATTORNEY DISQUALIFICATION

### A. The Lawyers' Ethical Duties

■ "When an attorney undertakes litigation against a former client, the attorney may be disqualified if the new representation violates an ethical duty to the former client." *Cannon v. U.S. Acoustics Corp.,* 398 F.Supp. 209, 221 (N.D.Ill.1975), *adopted and aff'd in relevant part,* 532 F.2d 1118 (7th Cir.1976). The disqualification remedy serves to "enforce the lawyer's duty of absolute fidelity and to guard against the danger of inadvertent use of confidential information, as well as to continue to achieve a high regard for the legal profession in the public mind . . . ." *Freeman v. Chicago Musical Instrument Co.,* 689 F.2d 715, 723 (7th Cir.1982) (citations omitted). Essentially, disqualification is designed to encourage clients to fully disclose all information necessary for their attorneys to adequately prepare their cases.[5] *See Cannon,* 398 F.Supp. at 221.

The defendants claim that Arvey Hodes has violated Canons 4,[6] 5,[7] and 9 [8] of the American Bar Association Code of Professional Responsibility (the "Code"), which "[t]his District Court has adopted . . . as an appropriate guideline for the conduct of attorneys admitted to practice before it (General Rules 6(a)(i)), and [which] our Court of Appeals has regularly relied upon . . . in the disqualification area." *Kadish v. Commodity Futures Trading Commission,* 548 F.Supp. 1030, 1032 (N.D.Ill.1982). *See also Resnick v. American Dental Association,* 95 F.R.D. 372, 378 (N.D.Ill.1982) (noting that "[c]ourts consistently employ provisions of the Code as sources of procedural and substantive law"). The major thrust of defendants' claim is that Arvey Hodes' representation of plaintiffs violates confidences established between Maeir and the Arvey Hodes attorneys at their meeting in early July of 1981. If such representation does violate confidences it would seem to violate Canon 4. If it does not, however, Arvey Hodes' representation of plaintiffs could still violate Canon 9 if it even "appeared" to be professionally improper.[9]

■ By requiring attorneys to preserve the confidences of their clients the Canons seek to achieve two goals. Canon 4's prohibition against an attorney's use of confidences obtained in his prior representation of his current client's opponent seeks to ensure fundamental fairness and prevent an unfair informational advantage. More importantly, by ensuring confidentiality the Canons foster an atmosphere of trust and encourage clients to fully disclose information to their attorneys. If this confidentiality were not ensured clients might withhold

---

5. For a detailed discussion of attorney disqualification see *Developments in the Law-Conflicts of Interest in the Legal Profession,* 94 Harv.L. Rev. 1244 (1981); Note, *Attorney's Conflict of Interests: Representation of Interest Adverse to that of Former Client,* 55 Bost.U.L.Rev. 61 (1975); Note, *Disqualification of Attorneys for Representing Interests Adverse to their Former Clients,* 64 Yale L.J. 917 (1955).

6. "A lawyer should preserve the confidences and secrets of a client." ABA Code of Prof. Resp. Canon 4 (1980).

7. "A lawyer should exercise independent professional judgment on behalf of a client." ABA Code of Prof.Resp. Canon 5 (1980).

8. "A lawyer should avoid even the appearance of professional impropriety." ABA Code of Prof.Resp. Canon 9 (1980).

9. The parties have limited their discussion and argument to Canons 4 and 9, although defendants do briefly mention Canon 5. Without the input of the parties to this litigation, the court will not embark on an analysis of Canon 5 as a basis for disqualification.

critical information that their attorneys need to represent them effectively. The Seventh Circuit has recognized that Canon 4's central purpose is to "encourage the free transfer of confidential information from client to attorney . . . ." *Novo Terapeutisk Laboratorium A/S v. Baxter Travenol Laboratories, Inc.,* 607 F.2d 186, 191 (7th Cir. 1979). The importance of full disclosure by the client was also emphasized in *Cannon.* Quoting from an ethical consideration accompanying Canon 4, the district court in *Cannon* noted:

> Both the fiduciary relationship existing between lawyer and client and the proper functioning of the legal system require the preservation by the lawyer of confidences and secrets of one who has employed or sought to employ him. A client must feel free to discuss whatever he wishes with his lawyer and a lawyer must be equally free to obtain information beyond that volunteered by his client. A lawyer should be fully informed of all the facts of the matter he is handling in order for his client to obtain the full advantage of our legal system. It is for the lawyer in the exercise of his independent professional judgment to separate the relevant and important from the irrelevant and unimportant. The observance of the ethical obligation of a lawyer to hold inviolate the confidences and secrets of his client not only facilitates the full development of facts essential to proper representation of the client but also encourages laymen to seek early legal assistance.

398 F.Supp. at 222.

■ In addition to protecting the attorney-client relationship and encouraging full disclosure, the Code's conflict of interest provisions preserve the integrity and favorable public image of both the legal profession and the judicial system, by prohibiting even "the appearance of professional impropriety." ABA Code of Professional Responsibility Canon 9 (1980). This second goal of the Code, however, does not come without certain costs. For example, in cases where a lawyer has received no client confidences the appearance of impropriety standard is clearly over-inclusive; disqualification in such situations accomplishes nothing toward preserving confidentiality. Additionally, this standard may often cause a significant hardship on a client by depriving him of an attorney chosen for his specialized knowledge and already familiar with the client's case. Finally, such a standard may adversely affect attorneys because "[u]nnecessary disqualification may blemish the attorney's professional reputation with an 'undeserved and unfair stigma.' " *Developments in the Law—Conflicts of Interest in the Legal Profession,* 94 Harv.L.Rev. 1244, 1320 (1981) (citing *Government of India v. Cook Industries,* 569 F.2d 737, 741 (2d Cir. 1978) (Mansfield, J., concurring)). Nevertheless, in promulgating the Code, the American Bar Association has determined that these costs are sufficiently outweighed by the interest in preserving the public's trust in attorneys.

### B. The Attorney-Client Relationship

■ Before an attorney becomes subject to the obligations of the Code, an attorney-client relationship must be found to exist. *See e.g., In re Yarn Processing Patent Validity Litigation,* 530 F.2d 83, 90 (5th Cir. 1976). In *Westinghouse Electric Corp. v. Kerr-McGee Corp.,* 580 F.2d 1311 (7th Cir. 1978), the Seventh Circuit adopted a subjective approach to determining the existence of attorney-client relationships.[10] It held

---

**10.** Under this approach the court looks to the nature of the work performed and to the circumstances under which the confidences were divulged. For instance, if the work performed by the attorney were within his professional capacity as a legal advisor, an attorney-client relationship would be established, and the attorney would owe a fiduciary duty to the client.

Legal consultation occurs when the *client* believes that he is approaching an attorney in a professional capacity with a manifest intent to seek professional legal advice. Thus, the "deciding factor is what the prospective client thought when he made the disclosure, not what the lawyer thought."
*Developments in the Law—Conflicts of Interest in the Legal Profession,* 94 Harv.L.Rev. 1244,

that such relationships depend neither upon the payment of fees nor upon the execution of a formal contract. *Id.* at 1317. More importantly, *Kerr-McGee* established that "[t]he fiduciary relationship existing between lawyer and client extends to preliminary consultation with a view to retention of the lawyer, although actual employment does not result." *Id.* at 1319 (footnote omitted). The Seventh Circuit also concluded that the attorney-client relationship "hinges upon the client's belief that he is consulting a lawyer in that capacity and his manifested intention to seek professional legal advice." *Id.* (quoting C. McCormick, Law of Evidence § 88 at 179 (2d ed. 1972)).

### C. The Substantial Relationship Test

The seminal case establishing the present standard for attorney disqualification is *T.C. Theatre Corp. v. Warner Bros. Pictures,* 113 F.Supp. 265 (S.D.N.Y.1953). In that case, a private antitrust action, two defendant movie companies sought to disqualify several of the plaintiffs' attorneys. The defendants argued that the plaintiffs' lead attorney, who had previously represented the defendants in a nearly identical antitrust action brought by the Government, was attempting to prove against them the same charges he previously had defended. The *T.C. Theatre* court held that "where any substantial relationship can be shown between the subject matter of a former representation and that of a subsequent adverse representation, the latter will be prohibited." *Id.* at 268. Further, the court declared that it

> will assume that during the course of the former representation confidences were disclosed to the attorney bearing on the subject matter of the representation. It will not inquire into their nature and extent. Only in this manner can the lawyer's duty of absolute fidelity be enforced and the spirit of the rule relating to privileged communications be maintained.

*Id.* at 268–69. *T.C. Theatre* announced the following standard, commonly referred to as the substantial relationship test: where

"it can reasonably be said that in the course of the former representation the attorney might have acquired information related to the subject of his subsequent representation . . . then the relationship between the two matters is sufficiently close to bring the later representation within the prohibition of [the Code]." *Id.* at 269.

*T.C. Theatre's* substantial relationship test was first adopted by the Seventh Circuit in *Cannon v. U.S. Acoustics Corp.,* 398 F.Supp. 209, 223–25 (N.D.Ill.1975), *adopted and aff'd in relevant part,* 532 F.2d 1118, 1119 (7th Cir.1976). Quoting extensively from *T.C. Theatre,* the *Cannon* court noted that

> although the burden of establishing the substantial relationship is on the party seeking to disqualify the opposing attorney, a close case should be resolved in the movant's favor. This position is entirely consistent with the . . . aim of Canon 9 to avoid the appearance of impropriety. . . . Therefore, if it can reasonably be found that the attorney might have acquired information in the former representation that is related to the subject matter of the subsequent representation, the attorney must be disqualified.

*Id.* at 224 (footnote and citations omitted).

In *Schloetter v. Railoc of Indiana, Inc.,* 546 F.2d 706 (7th Cir.1976), the Seventh Circuit found the *T.C. Theatre* substantial relationship test to be a "well-settled rule." *Id.* at 710. *Schloetter* further noted that where a substantial relationship is found to exist courts are precluded from inquiring "into whether confidential information relating to the matter involved in the subsequent representation did in fact pass to the attorney during the course of the former representation; his possession of such information will be presumed." *Id.*

In *Westinghouse Electric Corp. v. Gulf Oil Corp.,* 588 F.2d 221 (7th Cir.1978), the Seventh Circuit first articulated its three-step approach to the substantial relationship test. The court declared that

1321–22 (1981) (footnotes omitted and emphasis in original).

[i]nitially the trial judge must make a factual reconstruction of the scope of the prior legal representation. Second, it must be determined whether it is reasonable to infer that the confidential information allegedly given would have been given to a lawyer representing a client in those matters. Finally, it must be determined whether that information is relevant to the issues raised in the litigation pending against the former client.

*Id.* at 225. This tripartite analysis continues to be employed by the Seventh Circuit. *See e.g., LaSalle National Bank v. County of Lake,* 703 F.2d 252, 255–256 (7th Cir. 1983); *Freeman v. Chicago Musical Instrument Co.,* 689 F.2d 715, 722 (7th Cir.1982); *Novo Terapeutisk Laboratorium A/S v. Baxter Travenol Laboratories, Inc.,* 607 F.2d 186, 190 (7th Cir.1979).

 In applying this standard the court has emphasized that it is inappropriate to inquire whether confidences actually were disclosed. *See e.g., Gulf Oil,* 588 F.2d at 224. Instead, once a substantial relationship is found to exist, it is irrebuttably presumed that the client disclosed confidential information to his attorney. *Id.* But *see LaSalle National Bank,* at 257 (suggesting that presumption is rebuttable). Further, the court presumes that the attorney communicates this information to other members of his firm. When an attorney joins a different law firm after the former client confided in him, the presumption that confidential information has been passed on to members of the second firm is a rebuttable one. *See e.g., LaSalle National Bank,* at 257–258; *Novo,* 607 F.2d at 196–97 (*en banc*). Moreover, when an attorney other than the attorney to whom the client confided moves on to another law firm, the presumption that the moving attorney was privy to the previous confidences is likewise rebuttable. *Freeman,* 689 F.2d at 722. However, where the attorney who received

the client's disclosures remains at the same law firm, knowledge of this confidential information is, customarily, conclusively imputed to the entire firm. *See e.g. Kerr-McGee,* 580 F.2d at 1321; *Schloetter,* 546 F.2d at 710. *See also MPL, Inc. v. Cook,* 498 F.Supp. 148, 151 (N.D.Ill.1980). To determine whether defendants' motion should be granted in the instant case, this court must apply the above principles to the facts presented.

## III. APPLICATION OF PRINCIPLES

Initially, this court must decide whether an attorney-client relationship arose between Maeir and Arvey Hodes. Defendants claim that, during the July 1981 meeting, Maeir disclosed confidential information with a view toward retaining Arvey Hodes and with a belief that an attorney-client relationship existed. Arvey Hodes argues in response that because the firm was never formally retained by Maeir no attorney-client relationship arose from this meeting. This argument was expressly rejected by the Seventh Circuit in *Kerr-McGee.*

 The mere fact that Maeir neither paid any fees to Arvey Hodes, nor executed a formal contract with them, does not preclude a finding of an attorney-client relationship. Because Maeir reasonably believed that he was consulting the Arvey Hodes attorneys in their professional capacity, and with a view toward retaining them, this court concludes that an attorney-client relationship did arise at the meeting between Maeir and the Arvey Hodes lawyers. Consequently, those attorneys became subject to the obligations of Canon 4.[11]

Next, this court must determine whether the Code requires disqualification of Arvey Hodes as plaintiffs' counsel. Such a determination involves an application of this circuit's three-step substantial relationship

---

**11.** The Seventh Circuit has acknowledged that "[t]he central purpose of Canon 4 is to encourage the free transfer of confidential information from client to attorney, and *this canon comes into force regardless of whether an attorney has rendered legal advice.*" *Novo,* 607 F.2d at

191 (emphasis supplied). Accordingly, Arvey Hodes' claim that its attorneys merely informed Maeir of the costs involved with retention and did not provide any legal advice is irrelevant for purposes of Canon 4's confidentiality requirement.

test. The first and last steps of this inquiry can be disposed of quickly.

Step one requires the court to "make a factual reconstruction of the prior legal representation." *Gulf Oil,* 588 F.2d at 225. In the present case it appears that the entire legal representation consisted of a single meeting. Step three requires the court to determine whether confidential information, if disclosed by the former client, "is relevant to the issues raised in the litigation pending against [him]." *Id.* This court finds it rather difficult to believe that, assuming Maeir disclosed confidential information to the Arvey Hodes lawyers, such information would be irrelevant to the issues pending before this court. Both Arvey Hodes and the defendants admit that the July meeting dealt primarily with whether Maeir should retain Arvey Hodes as a separate counsel to represent him in the pending SEC investigation. The subject matter of that investigation is substantially identical to the issues raised in this private litigation. This court concludes that if confidential information was disclosed by Maeir, it is relevant to the issues in this litigation.

The more difficult question is whether Maeir has satisfied the second prong of the Seventh Circuit's tripartite substantial relationship test: "whether it is reasonable to infer that the confidential information allegedly given would have been given to a lawyer representing a client in those matters." *Id.* At this point it is important to note that "[e]ven the briefest conversation between a lawyer and a client can result in the disclosure of confidences. It is the relationship between the prior representation and the present litigation that must be evaluated rather than simply the duration and extent of the past representation." *Novo,* 607 F.2d at 195 (*en banc*). Consequently, the mere fact that Arvey Hodes' representation of Maeir encompassed no more than a one-hour meeting does not preclude a finding that material confidences were disclosed. Similarly, the fact that Maeir never paid Arvey Hodes any fees is irrelevant to determining wheth-

er confidential information was disclosed. "A confidence can be revealed on a related subject matter in a brief moment and without the client being charged a nickel." *Id.* at 189.

While Arvey Hodes contends that the only matters discussed at the one-hour meeting were the costs and benefits of separate representation, that is a factual dispute which this court need not resolve. The standard is objective. And it is reasonable to infer that before an attorney provides a prospective client with an honest and accurate projection of the expenses involved in retention, especially in a complex securities regulation case, he first has obtained confidential information from the client respecting the subject matter of the engagement. This court thus concludes from the purpose of the meeting that it is a reasonable inference that Maeir disclosed confidential information to the Arvey Hodes attorneys regarding matters related to the present litigation.

Two circuits appear to view such an inference as rebuttable, at least in cases of "peripheral representation." *See e.g., Trone v. Smith,* 621 F.2d 994, 998 n. 3 (9th Cir.1980); *Silver Chrysler-Plymouth, Inc. v. Chrysler Motors Corp.,* 518 F.2d 751, 756–57 (2d Cir.1975). The Seventh Circuit, however, has expressly rejected this view. *See Novo,* 607 F.2d at 191–92. Furthermore, the court has repeatedly stated that this presumption is irrebuttable. *See e.g., Novo,* 607 F.2d at 197 (*en banc*); *Gulf Oil,* 588 F.2d at 224, n. 3. *See also International Paper Co. v. Lloyd Manufacturing Co.,* 555 F.Supp. 125 at 133 (N.D.Ill.1982); *MPL, Inc. v. Cook,* 498 F.Supp. 148, 150–51 (N.D.Ill. 1980). Nevertheless, in *LaSalle National Bank,* the Seventh Circuit's most recent statement on attorney disqualification, this presumption was declared to be rebuttable.

In that case, the court said

[i]f, after evaluating the facts of this case according to this three-part standard, we find that such a substantial relationship did exist, we are entitled to presume that the attorney received confidential infor-

mation during his prior representation. *Schloetter,* 546 F.2d at 710. This presumption, however, is a rebuttable one. *Novo Terapeutisk,* 607 F.2d 197; *Freeman,* 689 F.2d at 722. Thus, if the first step of our analysis reveals a substantial relationship, we must still proceed to inquire whether the presumption of receipt of confidential information has been adequately rebutted in this case. *Freeman,* 689 F.2d at 723.

*LaSalle National Bank,* at 256. After carefully examining the above language, this court must admit that it is more than slightly perplexed as to precisely what the law on disqualification now is in this circuit.

Unlike any prior Seventh Circuit decision, *LaSalle National Bank* held the presumed receipt of confidential information to be rebuttable. Yet, in reaching this holding the court relied solely on language from *Novo* and *Freeman* dealing exclusively with a second presumption, discussed *infra,* which imputes knowledge of such information to the attorney's entire firm. For example, the *LaSalle National Bank* court noted that in determining whether the first presumption has been rebutted, "a court may consider a number of factors, including, *inter alia,* the size of the attorney's law firm, area of specialization of the attorney and his position with the firm. *Freeman,* 689 F.2d at 723." *LaSalle National Bank,* at 257. But the *Freeman* court considered these factors only for the purpose of answering "[t]he question as to what quality or quantity of proof is actually necessary to rebut the *presumption of imputed knowledge* . . . ." *Freeman,* 689 F.2d at 723 (emphasis supplied). Those factors are indeed pertinent to the imputation of knowledge of confidential information to all members of a law firm but they have no relevance whatsoever to the confidential character of the information transmitted by a client to a particular attorney.

Permitting rebuttal of the presumption that confidential information was transmitted conflicts with policy and precedent in this circuit. As a result, courts would inevitably be required to probe into the specifics

of the disclosures made by a client to his attorney. Such inquiry would invade the confidentiality of the attorney-client relationship, thereby undermining the very values the Canons seek to protect through the disqualification procedure. *See Novo,* 607 F.2d at 197 (*en banc*); *International Paper,* 555 F.Supp. at 133; *MPL,* 498 F.Supp. at 150; *T.C. Theatre,* 113 F.Supp. at 269. Permitting this presumption to be rebutted also conflicts with Canon 9's prohibition against "even the appearance of professional impropriety." *Novo,* 607 F.2d at 197 (*en banc*). In light of the apparent confusion in the *LaSalle National Bank* opinion over the holdings in *Novo* and *Freeman,* the clear precedent established in those decisions, and the strong policies favoring a conclusive presumption of shared confidences, this court declines to inquire into the substance of the conversations between Maeir and the Arvey Hodes lawyers absent a clear statement from the Seventh Circuit that the law has changed.

The second presumption which arises upon concluding that Arvey Hodes' representation of plaintiffs is substantially related to its former representation of Maeir, is that Maeir's confidential disclosures were communicated by the two Arvey Hodes attorneys to the other members of the firm. Prior to *Novo* there was little doubt that this presumption, like the presumed disclosure of confidential information by the client to the individual attorney, was irrebuttable. *See e.g., Kerr-McGee,* 580 F.2d at 1318, 1321; *Schloetter,* 546 F.2d at 710. In *Novo,* however, the Seventh Circuit declared the second presumption to be rebuttable. 607 F.2d at 197 (*en banc*). Within the last year the court has twice reaffirmed the rebuttable nature of this presumption. *See LaSalle National Bank,* at 257–258; *Freeman,* 689 F.2d at 722–23.

*Novo, Freeman* and *LaSalle National Bank* involved situations in which an attorney joined a different law firm after he or others in his prior firm had received confidential information from a former client; this is commonly termed the "shifting associate problem." In such instances several

justifications exist for making the second presumption rebuttable. *Freeman* recognized that "an irrebuttable presumption 'might seriously jeopardize [young lawyers'] careers by temporary affiliation with large law firms.' *Laskey Bros. of West Virginia, Inc. v. Warner Bros. Pictures,* 224 F.2d 824, 827 (2d Cir.1955), *cert. denied,* 350 U.S. 932, 76 S.Ct. 304, 100 L.Ed. 814 (1956)." *Freeman,* 689 F.2d at 723 n. 11. *LaSalle National Bank* noted that

> [i]f past employment in government results in the disqualification of future employers from representing some of their long-term clients, it seems clearly possible that government attorneys will be regarded as "Typhoid Marys." Many talented lawyers, in turn, may be unwilling to spend a period in government service, if that service makes them unattractive or risky for large firms to hire.

At 258.

The interest in avoiding "even the appearance of impropriety" is outweighed, in the shifting associate situation, by the interest of the client of the law firm to which the associate has moved, in maintaining what may well be a long-standing relationship with a law firm chosen for its specialized knowledge and already familiar with the client's case. Policy dictates that a law firm which is hiring a new attorney should not be held to the same conflict-of-interest standard as the law firm which is deciding to provide legal services for a new client.

Finally, the *Novo* decision was expressly limited to the facts of that case involving a shifting associate. Faced with such a situation, the court declared that *"[t]he circumstances of this case* demonstrate that the presumption that [the shifting attorney] shared confidences with associates at [his new] firm need not be irrebuttable." *Novo,* 607 F.2d at 197 (*en banc*) (emphasis supplied).

In other circumstances, however, the validity of the pre-*Novo* standard established in *Schloetter* remains. In that case the Seventh Circuit declared that where an attorney remains with a law firm after receiving confidential information from a client

> the confidential information presumptively possessed by him [is] imputed to the other members of the [firm] .... This [will] result in their disqualification, irrespective of whether or not they had actually been exposed to such confidences. To adopt another rule under these circumstances would be to completely ignore the dictates of Canon 9.

546 F.2d at 710. *See also Kerr-McGee,* 580 F.2d at 1318, 1321. This approach generally remains good law, despite *Novo's* analysis.

The question remains whether, in the circumstances here presented, the pre-*Novo* standard applies. This court does not believe that it does.

■ *Novo, Freeman* and *LaSalle National Bank* all rest, ultimately, upon the practical realities of law firm practice, and those realities must be recognized here. Witz and David interviewed a potential client in the summer of 1981. Maier did not become a client. While it is reasonable to infer, as previously discussed, that Maier shared confidences at that interview, it is not necessarily reasonable, and certainly not compelling, to infer that the two attorneys in turn shared any of those confidences with others in the firm pending Maier's decision whether or not to retain the firm. The practice of law is sufficiently demanding to preclude, generally, idle discussion about the affairs of persons who were interviewed but did not become clients. Further, an irrebuttable presumption of imputed knowledge could destroy long continued relationships (and the Mesirows apparently had such a relationship with the Arvey Hodes firm) without any possible means for preventing that destruction.

The purpose of the interview was, after all, to determine whether or not the firm would represent Maier respecting a specific matter, the nature of which the attorneys could not know until Maier told them. One significant purpose of such a meeting is to determine whether there are any reasons why the firm cannot undertake the representation, possibly because of a conflict im-

mediately apparent to the interviewing attorneys and resulting in an immediate end to the interview or possibly because of a conflict of which they are unaware and of which they become aware after the possible engagement is checked to determine whether any conflict of interest does exist. A conclusive presumption arising from an initial interview would cause the mechanism intended to avoid conflicts to become an inexorable mechanism for disqualification.

Obviously, Witz and David could not personally represent the plaintiffs in this case. Normal clearance procedures should disclose any potential conflicts in the event the firm is disposed to take a case, thus permitting early application of the kind of screening arrangements mandated by *LaSalle National Bank*. Here, however, there was, understandably, no clearance procedure because there was no client. A screening arrangement was not established until the prior contact with Maier was brought to the attention of the firm by the motion to disqualify. Witz and David have sworn that they did not share any confidences with others in the interim. The narrow question thus becomes whether or not a failure to establish a screening arrangement, when the plaintiffs in this action retained Arvey Hodes, leads, as in *LaSalle National Bank,* to disqualification now.

The most troublesome aspect of the motion is that the Arvey Hodes clearance procedures are apparently confined to a files check. Such a check would not have alerted anyone to a possible conflict when Arvey Hodes agreed to represent the plaintiffs; since Maier never was a client there was no file. Parenthetically, it should be noted that a files check may not reveal even the most obvious conflict, *e.g.,* a new client seeks to sue a person who, it later turns out, is the chief executive officer of a corporate client. More relevantly here, however, if a "new cases" memorandum briefly describing the subject matter and the parties had

been circularized within the firm about the time Arvey Hodes undertook responsibility for the case in March 1982—about nine months after the interview—it is possible, indeed likely, that Witz or David or both would have recalled the meeting with Maier and the screening arrangements mandated by *LaSalle National Bank* could have been instituted. As it was, no connection was made between the earlier interview and this case until the motion to disqualify was filed several months later. It is possible that such a circularizing would not have led to a personal perception or recollection of such a connection, in which event it can hardly be said that the firm can be charged with the knowledge of information which the recipients had found to be so forgettable.[12] But at least the risks of running afoul of disqualification principles would have been minimized.

In any event, this case is unlike *LaSalle National Bank.* There the firm had actual knowledge that an attorney had previous continuing litigation and supervisory responsibilities for Lake County when the firm brought an action against Lake County concerning a subject area within those responsibilities. Here the undisputed facts are that the knowledge by the firm of the prior discussion with Maier could be by imputation only, no confidences (if there were any) were shared by Witz and David prior to the disqualification motion, the circumstances do not suggest any significant likelihood of such sharing prior to the motion, and a screening arrangement was then instituted.

The motion to disqualify is therefore denied.

## ON MOTION FOR RECONSIDERATION

Defendants have moved for reconsideration of this court's May 27, 1983 Memorandum and Order in light of the Seventh Circuit's May 31 decision in *Analytica, Inc.*

---

**12.** It is interesting to note that Maier himself exhibited some forgetfulness regarding the actors involved in this dispute. Although he received the October 9, 1980 letter from Sosin, written on Arvey Hodes stationery, he apparently forgot about it when he consulted other Arvey Hodes lawyers following the letter. At the very least he did not see the inherent conflict in such a consultation.

674

*v. NPD Research, Inc.,* 708 F.2d 1263 (7th Cir.1983). In that case the Seventh Circuit adopted with renewed vigor the conclusive presumption left uncertain by *LaSalle National Bank.* The court there, however, as in its prior opinions, was not dealing with a question of an initial contact not thereafter leading to continuing representation, and this court does not consider it as indicating any view respecting the issue here decided.

Defendant's motion for reconsideration is denied.