Angeline CALLAS, Rita M. Fortino and Kirk M. Donald, Plaintiffs,

v.

Peter PAPPAS, Defendant.

No. 95–C–270.

United States District Court, E.D. Wisconsin.

Nov. 8, 1995.

**DECISION AND ORDER**

CALLAHAN, United States Magistrate Judge.

On March 10, 1995, Plaintiffs Angeline Callas ("Callas"), Rita M. Fortino ("Fortino"), and Kirk M. Donald ("Donald") commenced this action against Defendant Peter Pappas ("Pappas"). The complaint contains seven causes of action: 1) federal securities antifraud violations, 2) Wisconsin anti-fraud violations, 3) intentional misrepresentation, 4) strict misrepresentation, 5) negligent misrepresentation, 6) conversion, and, 7) breach of fiduciary duty. On April 6, 1995, Attorney Randall R. Garczynski filed an answer and counterclaim on behalf of Pappas.

Subject matter jurisdiction is proper based upon diversity of citizenship and an amount in controversy over $50,000.00. 28 U.S.C. § 1332(a)(1). Venue is proper in the Eastern District of Wisconsin. The parties have consented to United States magistrate judge jurisdiction pursuant to 28 U.S.C. § 636(c) and Local Rule 13.05(a) (E.D.Wis.).

Currently pending before the court is the plaintiffs' Motion to Disqualify Defendant's Counsel. The Motion will be granted.

## I. BACKGROUND

Plaintiffs Callas, Fortino and Donald were investors in St. Moritz, Inc., a corporation formed by Defendant Pappas and operated as a restaurant. In August of 1993, Donald retained Illinois attorney Robert E. Burke to advise him regarding potential claims he had against Pappas. (Donald Aff., ¶ 2). Donald met with Attorney Burke on several occasions to discuss his potential claims and to exchange information and documents relating to his investment in St. Moritz, Inc. (Donald Aff., ¶ 2). Attorney Burke advised Donald to obtain an attorney in Wisconsin to represent his interests, and suggested the law firm of Garczynski & Brennan, S.C. (Donald Aff., ¶ 3, Burke Aff., ¶ 3).

With Donald's consent, Attorney Burke telephoned Attorney Michael Brennan of the law firm of Garczynski & Brennan, S.C. to inquire whether the firm would be interested in prosecuting Donald's claims against Pappas. (Donald Aff., ¶ 3; Burke Aff. ¶ 3; Brennan Aff., ¶ 9). Attorney Burke states that Attorney Brennan indicated that his partner, Randall Garczynski, had some experience in similar matters and that he likely would be interested in representing Donald. (Burke Aff., ¶ 3). Attorney Burke states that, upon Attorney Brennan's suggestion, he forwarded certain materials in his file to Attorney Garczynski for his review. (Burke Aff., ¶ 3). Attorney Brennan remembers indicating that Randall Garczynski handled

corporate and litigation matters, but states that he told Attorney Burke that his office was not likely to be interested in pursuing Donald's case on a contingency fee basis. (Brennan Aff., ¶ 9).

In any event, on August 30, 1993, Attorney Burke forwarded (faxed) copies of certain materials from his file to Attorney Garczynski, including correspondence and documents which related to Donald's investment in St. Moritz, Inc., as well as a memorandum composed by Attorney Burke which summarized his conversations with Donald and which contained his impressions of the merits of Donald's potential claims. According to Attorney Burke, he forwarded these materials to Attorney Garczynski with the expectation that Attorney Garczynski would agree to represent Donald in the prosecution of his claims, and that he would keep the information confidential. (Burke Aff., ¶ 4). Similarly, it was Donald's expectation at that time that Attorney Garczynski would represent him in the prosecution of his claims against Pappas. (Donald Aff., ¶ 3). It is undisputed that Attorney Garczynski received and reviewed these materials, (Garczynski Aff., ¶ 4). However, Attorney Garczynski asserts that he has only a "general recollection of glancing" at the materials and that they have since been destroyed in the normal course of business. (Garczynski Aff., ¶¶ 4, 7).

Sometime after his file was sent, Donald telephoned Attorney Garczynski to speak to him about his claims. However, Attorney Garczynski was out of the office when he called. (Donald Aff., ¶ 4). When his call was not returned, Donald spoke with Attorney Brennan regarding his case in September of 1993. (Donald Aff., ¶ 4; Brennan Aff., ¶ 14). Donald states that he briefly discussed the merits of his case with Attorney Brennan, and was informed that the firm was reluctant to represent him given the dollar value of his claims. (Donald Aff., ¶ 4). Donald maintains that he was told that the firm would be more inclined to proceed with litigation if the other two investors (Callas and Fortino) would agree to be represented by the firm as well. (Donald Aff., ¶ 4). Attorney Brennan states that he merely told Donald that the firm was not interested in taking a $10,000.00 contingency case. Moreover, he states that he did not discuss the details of the case with Donald. (Brennan Aff., ¶ 15).

Donald subsequently obtained legal representation from Attorney Kenneth Iwinski. On April 14, 1995, Donald received a copy of the answer and counterclaim which had been forwarded to him by Attorney Iwinski. When he noticed that the Garczynski & Brennan firm was representing the defendant, he telephoned Attorney Iwinski and informed him of his prior contacts with that law firm. (Iwinski Aff., ¶¶ 3, 4). Attorney Iwinski immediately faxed a letter to Attorney Garczynski in which he demanded Attorney Garczynski's immediate withdrawal from the case. (Iwinski Aff., Ex. A). On April 19, 1995, Attorney Garczynski responded in writing to the demand. (Garczynski Aff., ¶ 9; Iwinski Aff., ¶ 4, Ex. B). Attorney Garczynski indicated that he would not withdraw because he felt, **inter alia,** that 1) no attorney-client relationship had been formed, 2) that whatever documents had been received by his office would have been destroyed approximately 30 days after the August 30, 1993 correspondence, 3) that he had no independent recollection of any of the information Attorney Burke had sent him, and 4) he had only a vague recollection of having scanned the August 30, 1993, letter which Attorney Burke had provided to Attorney Garczynski's office. (Ex. B). Furthermore, Attorney Garczynski suggested that any conflict could be resolved by having Donald sign a waiver. (Ex. B).

After consulting with Donald, Attorney Iwinski, on May 9, 1995, notified Attorney Garczynski of Donald's refusal to consent to a waiver of the conflict. He renewed his demand for Attorney Garczynski's immediate withdrawal. (Iwinski Aff., Ex. C). Attorney Garczynski did not respond to the May 9, 1995, letter. (Iwinski Aff., ¶ 6). On July 21, 1995, Attorney Iwinski filed this Motion to Disqualify Defendant's Counsel.

## II. ANALYSIS

Determinations involving ethical issues are generally governed by federal law. *Freeman v. Chicago Musical Instrument Co.,* 689 F.2d 715, 722 (7th Cir.1982). However, Local

Rule 2.05(a) (E.D.Wis.) provides that attorneys who practice in this district are bound by the standards of conduct adopted by the Wisconsin Supreme Court and set forth in the Rules of Professional Conduct for Attorneys, SCR 20:1.1–8.5. Since the ethical codes adopted by both the Wisconsin Supreme Court and the Court of Appeals for the Seventh Circuit are based on the A.B.A. Model Rules of Professional Conduct, the standards applicable to disqualification motions in both forums are essentially identical. *Powell v. Adams,* 763 F.Supp. 406, 407 (E.D.Wis.1991).

A lawyer has a near absolute duty to "preserve the confidences and secrets of a client." (Canon 4, A.B.A. Model Rules of Professional Conduct). In addition, Model Rule 1.7 generally precludes a lawyer from creating an attorney-client relationship with more than one adversary in a legal action. (*See also,* SCR 20:1.7). Similarly, Model Rule 1.9 limits lawyers from entering into new attorney-client relationships that affect the interests of former clients. (*See also,* SCR 20:1.9). Conflicts of interest pertaining to one member of a law firm may be imputed to the other members of the firm. (Model Rule 1.10; *see also,* SCR 20:1.10). Finally, Canon 9 of the A.B.A. Model Rules of Professional Conduct specifies that "a lawyer should avoid even the appearance of professional impropriety."

Plaintiffs assert that Attorney Garczynski's subsequent representation of Pappas, an adverse party in the same matter about which his firm previously consulted with Donald, violates the ethical rules which govern attorney conduct. On the other hand, Pappas argues that since there was no express or implied attorney-client relationship formed between Donald and Attorney Garczynski, disqualification is not required. Moreover, Pappas asserts that a less severe measure, such as a protective order barring the defendant from using any of the materials forwarded to him by Attorney Burke, is appropriate in this case.

■ In order to prevail on their motion, the plaintiffs must demonstrate 1) that there was an attorney-client relationship between the moving party and opposing counsel; and, 2) that the subject matter of the current suit is "substantially related" to the matters at issue in the attorney's prior representation. *Schloetter v. Railoc of Indiana, Inc.,* 546 F.2d 706, 710 (7th Cir.1976).

## A. The Existence of an Attorney–Client Relationship.

■ Of course, a threshold question presented by this motion is whether there was an attorney-client relationship between Donald, and Garczynski and Brennan, S.C., that would impose upon that firm the ethical obligation of preserving confidential communications. For such a relationship to exist, the parties need not have executed a formal agreement. *Westinghouse Elec. Corp. v. Kerr–McGee Corp.,* 580 F.2d 1311, 1317 (1978) (*citation omitted* ); cert. denied, 439 U.S. 955, 99 S.Ct. 353, 58 L.Ed.2d 346 (1978). Nor does the relationship depend upon the payment of fees. *Id.* Rather, the professional relationship for purposes of attorney-client communications "hinges upon the client's belief that he is consulting a lawyer in that capacity and his manifested intention to seek professional legal advice." *Westinghouse,* 580 F.2d at 1319 (*citation omitted* ).

■ In *Westinghouse,* a multi-city law firm contracted with the American Petroleum Institute (API) to obtain confidential information from various oil companies regarding their uranium industries and assets. When the questionnaires were sent to the various oil companies, they contained the following language:

[The law firm] is acting as an independent special counsel for API, and will hold any company information in strict confidence, not to be disclosed to any other company, or even to API, except in aggregated or such other form as will preclude identifying the source company with its data.

*Westinghouse,* 580 F.2d at 1313. The questionnaire explained that the information sought was to assist the law firm "in preparing positions, arguments and testimony in opposition to this type of legislative [divestiture]." *Id.* The data was eventually compiled and released in a report to the United States Congress which took an affirmative position on the subject of competition in the

uranium industry. On the same day that the report was published, the law firm filed an anti-trust suit on behalf of a supplier who was seeking to establish an illegal conspiracy in the uranium industry. The lawsuit named as defendants several of the oil companies that had submitted confidential information to the law firm in response to the API questionnaire. Those defendants moved to disqualify the law firm from representing the plaintiff.

The *Westinghouse* court noted that there are "several fairly common situations where, although there is no express attorney-client relationship, there exists nevertheless a fiduciary obligation or an implied professional relation." *Westinghouse*, 580 F.2d at 1319. It went on to state that a fiduciary relationship exists during a preliminary consultation between a lawyer and prospective client with a view to retention of the lawyer, even where actual employment does not result. *Id.* The court noted that each of the moving defendants in that case had submitted affidavits in which it was stated that they had submitted data to the firm because they believed that the firm would render legal services to the oil companies in furtherance of their interests. *Id.* at 1320. Although the firm may have undertaken a "lobbying-type" function, the court pointed out that the firm, in soliciting confidences from the oil companies, "did not disavow its capacity as attorneys but came expressly represented as lawyers." *Id.* The court concluded that the firm could not represent the plaintiff in its anti-trust suit against the moving defendants.

In *Hughes v. Paine, Webber, Jackson & Curtis, Inc.*, 565 F.Supp. 663 (N.D.Ill.1983), the district court applied the principles set forth in *Westinghouse* and found an attorney-client relationship to have arisen in a factual scenario similar to the instant case. The facts in *Hughes* were as follows: In the summer of 1980, Raymond and Lilli Mesirow (hereinafter "the Mesirows") consulted with a partner at the law firm of Arvey, Hodes, Costello & Burman (hereinafter "Arvey Hodes") regarding certain complaints about the handling of their accounts at Paine, Webber, Jackson & Curtis, Inc. (hereinafter "Paine Webber"). *Hughes*, 565 F.Supp. at 665. On October 9, 1980, the Arvey Hodes

attorney wrote to Paine Webber outlining these complaints and identifying Hillel Maeir (hereinafter "Maeir") as one of the persons responsible for the ill-handled account. *Id.* In the months to follow, the Securities Exchange Commission ("SEC") began conducting an investigation focusing on the accounts of five Paine Webber customers (including the Mesirows), all of whom subsequently became plaintiffs in the case.

In July of 1981, Maeir, who up until that point had been represented by counsel for Paine Webber, decided to obtain separate counsel for the pending SEC investigation. *Id.* Upon the suggestion of a colleague, Maeir met with a different attorney from Arvey Hodes in July of 1981. The meeting lasted approximately forty-five minutes. *Id.* The attorney maintained that all that was discussed at the meeting were the pros and cons of retaining separate counsel, *Id.* Maeir, on the other hand, asserted that the facts and circumstances concerning the accounts under SEC investigation were also discussed. *Id.* Both parties agreed that Maeir was not informed at this meeting that Arvey Hodes represented the Mesirows in connection with their accounts at Paine Webber. On September 8, 1981, the Mesirows, along with the other plaintiffs commenced the lawsuit. *Id.* at 665–66. At that time, they were represented by the law firm of Winston & Strawn. However, lawyers from Arvey Hodes were eventually substituted as counsel for plaintiffs. The defendants subsequently filed a motion to disqualify Arvey Hodes.

Although the court in *Hughes* ultimately denied the motion to disqualify on the grounds that the "substantial relationship" test had not been met, the court, applying *Westinghouse*, held:

> Because Maeir reasonably believed that he was consulting with the Arvey Hodes attorneys in their professional capacity, and with a view toward retaining them, this court concludes that an attorney-client relationship did arise at the meeting between Maeir and the lawyers.

*Hughes*, 565 F.Supp. at 669. The court in *Hughes* found the existence of an attorney-

client relationship despite the fact that the meeting was only forty five minutes long, and in the face of a dispute between the parties over what subjects had been discussed during the meeting.

In the present case, Donald clearly sought from Garczynski & Brennan, S.C., representation on his claims against Pappas. He did so after consulting with Attorney Burke, his retained attorney in Illinois. Acting on behalf of Donald, Attorney Burke telephoned Attorney Brennan regarding the case. In his affidavit, Donald states that he gave his consent to Attorney Burke because it was his understanding that Attorney Garczynski would represent him in the prosecution of his claims against Pappas. (Donald Aff., ¶ 3).

Although the parties dispute whether Attorney Brennan requested that Donald's file be forwarded to Attorney Garczynski, it is undisputed that Attorney Brennan and Attorney Burke did have a phone conversation concerning Garczynski and Brennan, S.C.'s possibly representing Donald on his claim against Pappas.[1] It is also undisputed that "certain materials in [Mr. Burke's] file ... including a memorandum [he] prepared which contained a summary of [his] conversations with Mr. Donald and [his] impressions concerning the merits of Mr. Donald's potential claims" were forwarded by Attorney Burke to Attorney Garczynski "for his review and consideration." (Burke Aff., ¶ 4). It is also undisputed that Attorney Garczynski read at least some of the materials which were forwarded to him. (Garczynski Aff., ¶ 4).

I find that a fiduciary obligation and implied professional relationship was created when Donald authorized the forwarding of confidential material to Attorney Garczynski, and it was received and reviewed by Attorney Garczynski. Donald authorized the forwarding of the materials, with the expectation that Attorney Garczynski would render

legal services—review the file and decide to represent Donald in his claims against Pappas. Just as in *Westinghouse* and *Hughes*, it is irrelevant that Attorney Garczynski ultimately concluded that he was not interested in representing Donald. Although Pappas argues that an attorney-client relationship could not have formed because Attorney Garczynski and Donald never met personally, his argument is without merit. Although Attorney Garczynski and Donald never met, what transpired here was the equivalent of a "preliminary consultation by a prospective client with a view to retention of the lawyer." *Westinghouse*, 580 F.2d at 1319. Even if Attorney Garczynski only briefly reviewed the materials forwarded to him, his review was akin to the short meeting that transpired in *Hughes*.

## B. The "Substantial Relationship" Test

■ Having determined that a fiduciary, implied professional relationship existed between Attorney Garczynski and Donald, the court must determine whether there is a "substantial relationship" between the present and prior representations. A lawyer may not represent an adversary of a former client if the subject matter of the two representations are "substantially related." *Analytica v. NPD Research, Inc.*, 708 F.2d 1263, 1266 (7th Cir.1983). A "substantial relationship" between two representations exists if a "lawyer could have obtained confidential information in the first representation that would have been relevant in the second." *Id.* (citations omitted). Furthermore, it is irrelevant whether the attorney actually obtained such information and used it against his former client. *Id.*

■ In the present case, there can be no doubt that Attorney Garczynski's prior and present representations are "substantially related" to each other because, in fact, they are two sides of the same litigational coin. At-

---

1. Attorney Brennan states in his Affidavit that he has "no specific recollection of ever discussing Robert E. Burke [sic] any details of the St. Moritz case other than the dollar amount and the fact that it would be handled on a contingency fee basis." (Brennan Aff., ¶ 10). That Mr. Brennan has not been able to deny the assertions in Attorney Burke's Affidavit leaves

me with the unrefuted assertion by Mr. Burke that "[his] conversation with Mr. Brennan included a discussion of the information Mr. Donald had previously provided to [Mr. Burke], as well as [Mr. Burke's] impressions of the merits of Mr. Donald's potential claims." (Burke Aff., ¶ 3).

torney Garczynski received materials from Donald that were directly related to the dispute in which Attorney Garczynski is now representing Pappas against Donald. Indeed, the materials contained Attorney Burke's impressions concerning the merits of Donald's potential claims against Pappas. Although Attorney Garczynski states that he has "no independent recollection of any other information Attorney Burke sent [him] and only a vague recollection of having scanned the August 30, 1993, letter which [Attorney Iwinski] provided to [his] office," (Garczynski Aff., ¶¶ A, B), such lack of recollection is not determinative of the issue presented by this motion. Because Attorney Garczynski actually obtained information from Donald that is relevant to his representation of Pappas, the "substantial relationship" test has been satisfied.

Although Pappas argues that disqualification is a severe, and unnecessary remedy in this case, I disagree. No matter what protective measures it sets up, a law firm may not switch sides if its former representation was substantially related to its new representation. *Analytica* at 1268.

> While 'appearance of impropriety' as a principle of professional ethics invites and maybe has undergone uncritical expansion because of its vague and open-ended character, in this case it has meaning and weight. For a law firm to represent one client today, and the client's adversary tomorrow in a closely related matter, creates an unsavory appearance of conflict of interest that is difficult to dispel in the eyes of the public—or for that matter the bench and bar—by the filing of affidavits, [which are] difficult to verify objectively, denying that improper communication has taken place or will take place ...

*Analytica* at 1269.

Lest there be any misunderstanding, I wish to make it clear that I do not find that Attorney Garczynski has engaged in any improper conduct. To the contrary, I have no doubt that he is being absolutely truthful when he asserts that he has no more than a vague recollection of having scanned the August 30, 1993, letter, and no recollection of any of the other information sent to him by Attorney Burke. It is, however, the undisputed portions of the scenario that occurred during August and September 1993, as recounted above, and my concern for the unblemished integrity of the litigational process, that compel my conclusion in this case. The court, in *Emle Industries, Inc. v. Patentex, Inc.*, 478 F.2d 562, 571 (2d Cir.1973), may have said it best:

> A lawyer's good faith, although essential in all his professional activity, is, nevertheless, an inadequate safeguard when standing alone. Even the most rigorous self-discipline might not prevent a lawyer from unconsciously using or manipulating a confidence acquired in the earlier representation and transforming it into a telling advantage in the subsequent litigation. Or, out of an excess of good faith, a lawyer might tend too far in the opposite direction, refraining from seizing a legitimate opportunity for fear that such a tactic might give rise to the appearance of impropriety. In neither event would the litigant's or the public's interest be well served. The dynamics of litigation are far too subtle, the attorney's role in that process is far too critical, and the public's interest in the outcome is far too great to leave room for even the slightest doubt concerning the ethical propriety of a lawyer's representation in a given case.

## III. CONCLUSION

This court concludes that 1) a fiduciary obligation and an implied attorney-client relationship was created when Donald authorized the forwarding of confidential material to Attorney Garczynski with the expectation that he would render legal services on his behalf, and such material was received and reviewed by Attorney Garczynski, 2) the creation of that relationship gave rise to Attorney Garczynski's ethical obligation to preserve confidential client communications, 3) the relationship was substantially related to Attorney Garczynski's current representation of Pappas, and 4) the Garczynski & Brennan law firm should be disqualified as defense counsel in this case in order to protect Donald's interests, the integrity of the litigation

process, and to avoid the appearance of impropriety.

A status/scheduling conference will be conducted in this matter on December 5, 1995 at 9:00 a.m. in my Courtroom, 200A; 517 E. Wisconsin Avenue, Milwaukee, Wisconsin. At that time, dates will be set to govern the further processing of this case.

**NOW THEREFORE, IT IS HEREBY ORDERED** that the Plaintiffs' Motion to Disqualify Defendant's Counsel be and hereby is **GRANTED.**

**SO ORDERED.**